[This opinion has been published in *Ohio Official Reports* at 78 Ohio St.3d 466.]

OHIO EDISON COMPANY, APPELLANT, *v.* PUBLIC UTILITIES COMMISSION OF

OHIO ET AL., APPELLEES.

[Cite as *Ohio Edison Co. v. Pub. Util. Comm.*, 1997-Ohio-196.]

*Public utilities—Public utility's authority to grant reduced-rate service to a*
*political subdivision not subject to R.C. 4905.33 prohibition against*
*furnishing below-cost service for the purpose of detroying competition.*

Pursuant to R.C. 4905.34, a public utility's authority to grant reduced-rate utility
service to a political subdivision is not subject to the R.C. 4905.33
prohibition against furnishing below-cost utility service for the purpose of
destroying competition.

(No. 95-2575—Submitted January 7, 1997—Decided May 21, 1997.)

APPEAL from the Public Utilities Commission of Ohio, No. 93-1408-EL-CSS.

_____

{¶ 1} This appeal involves an order by the Public Utilities Commission of
Ohio ("commission") resolving a complaint brought by Youngstown Thermal,
Limited Partnership ("Thermal") against Ohio Edison Company ("Ohio Edison")
for selling electricity below cost in violation of R.C. 4905.33.

{¶ 2} Thermal is a limited partnership that owns and operates a district
heating system that provides steam-heating service to approximately fifty buildings
in downtown Youngstown, Ohio. Thermal's general partner is primarily engaged
in acquiring, expanding, and operating district heating and cooling systems in
several cities, including Pittsburgh. Pursuant to the Certified Territory Act, Ohio
Edison is the monopoly electric provider for the city of Youngstown and vicinity.
Thermal and Ohio Edison presently compete for the heating load in Youngstown.

{¶ 3} In the 1980s, Mahoning County proposed construction of a 198,000
square foot jail facility in downtown Youngstown. The jail was to be built across

the street from Thermal's existing steam plant. A county building commission was created to determine various aspects of the construction and equipment to be used in the jail facility. Architectural and engineering firms were hired to prepare plans and specifications for the facility.

{¶ 4} Ohio Edison, being the monopoly electric provider for the Youngstown area, had no competitors for the general electric load at the jail and agreed to provide the general electric load service to the jail at Ohio Edison's standard commercial rate. Ohio Edison also sought to provide the cooling load at that same commercial rate. However, Thermal wanted to use the jail as the anchor for a district cooling system in Youngstown. Ohio Edison viewed the jail project as critical to protecting its existing downtown cooling-load customer base. Thus, Thermal and Ohio Edison began competing for the jail's cooling load.

{¶ 5} Thermal submitted a bid for the cooling-load to the building commission. Ohio Edison responded by offering cooling-load service at a reduced rate, a cash incentive to purchase the chillers, and a high efficiency lighting allowance of $30,000-$50,000. Each party then offered several progressively lower bids, including multiple-tiered, usage-based, fixed or capped rates and sizable cash incentives, in an effort to obtain the cooling-load bid at the jail facility.

{¶ 6} On September 22, 1993, the building commission met and publicly voted five to two to negotiate exclusively with Thermal for thirty days to finalize a contract. Ohio Edison continued to contact and discuss the project with the building commission members. Ohio Edison also sent a letter to the chairman of the building commission reaffirming that its offer remained on the table.

{¶ 7} On October 22, 1993, the building commission members learned that Thermal had negotiated a contract with the county representatives. Apparently, the building commission then deferred a vote on the Thermal contract until later in October, citing a need to review the contract terms. The commission disapproved the contract by a vote of four to three at its October 26 meeting. Ohio Edison next

2

offered to include an interest-free loan with its bid. On December 22, 1993, the Mahoning County Commissioners awarded the final contract ("service agreement"), including the cooling load, to Ohio Edison.

{¶ 8} On August 23, 1993, Thermal brought an R.C. 4905.26 complaint before the commission against Ohio Edison alleging that Ohio Edison was proposing to provide a cooling service without authority and that Ohio Edison had priced the cooling service below Ohio Edison's actual cost for the purpose of destroying competition in violation of R.C. 4905.33. Ohio Edison sought to dismiss the complaint because the proposed service agreement did not provide cooling services and was not subject to commission review under R.C. 4905.34. Ohio Edison's motion to dismiss was denied.

{¶ 9} At a prehearing conference, the parties agreed to narrow the issues for hearing and to submit briefs on one legal issue:

"[I]s the authority granted a utility by [R.C.] Section 4905.34, * * * to offer free or reduced rate service limited by [R.C.] Section 4905.33, * * * which prohibits a utility from furnishing free service or service for less than actual cost for the purpose of destroying competition[?]"

{¶ 10} The commission issued an entry finding that although these sections were not in conflict, the grant of authority in R.C. 4905.34 was limited by the statement in R.C. 4905.33 that a utility cannot provide reduced-rate service for the purpose of destroying competition. The commission stated that this entry was not final or appealable. Ohio Edison sought but was denied rehearing.

{¶ 11} The commission then conducted an evidentiary hearing on the issue of Ohio Edison's actual cost to provide the power for the cooling load at the jail project. Thermal presented two witnesses who testified that Ohio Edison was providing electrical energy below its actual cost for the cooling load to the jail project. Ohio Edison presented four witnesses who testified that the estimated total jail revenues would exceed the cost to serve the facility.

**{¶ 12}** The commission reviewed the conflicting evidence and held that Ohio Edison had violated R.C. 4905.33 by agreeing to provide the cooling-load power to the jail at a rate below Ohio Edison's actual cost for the purpose of destroying competition by Thermal. However, the commission assessed no civil forfeiture against Ohio Edison on the basis that this was the first time that the commission had been presented with the question at hand.

**{¶ 13}** Ohio Edison sought rehearing. Thermal did not seek rehearing, but it opposed Ohio Edison's application for rehearing. The commission denied Ohio Edison's application for rehearing.

**{¶ 14}** The cause is now before this court upon an appeal as of right.

_____

*James W. Burk, Michael R. Beiting* and *Anthony J. Alexander; Roetzel & Andress Co., L.P.A.,* and *George W. Rooney, Jr.,* for appellant.

*Betty D. Montgomery*, Attorney General, *Duane W. Luckey*, *William L. Wright*, *Thomas W. McNamee* and *Paul A. Colbert*, Assistant Attorneys General, for appellee, Public Utilities Commission of Ohio.

*Vorys, Sater, Seymour & Pease* and *John Winship Read*, for intervening appellee, Youngstown Thermal, Limited Partnership.

*Kaufman & Cumberland* and *Frank J. Cumberland*, urging affirmance for *amicus curiae*, AT&T Communications of Ohio, Inc.

*Chester, Willcox & Saxbe, John W. Bentine* and *Jeffrey L. Small*, urging affirmance for *amicus curiae*, American Municipal Power-Ohio, Inc.

_____

LUNDBERG STRATTON, J.

{¶ 15} Appellant poses numerous propositions of law arguing that the commission erred in its interpretation of R.C. 4905.34 and overstepped its authority in finding that Ohio Edison violated R.C. 4905.33. Each party also filed supplemental briefs on the two questions that we raised *sua sponte*: "Did the commission find that R.C. 4905.34 applies in the case at bar?" and "Does R.C. 4905.34 apply in a case involving a competitive bidding situation?" For the reasons that follow, we find that R.C. 4905.33 and 4905.34 are clear, unambiguous, and not in conflict. We also hold that a public utility's right to enter into a reduced-rate utility service contract with a political subdivision under R.C. 4905.34 is not limited by the last sentence of R.C. 4905.33, which prohibits below-cost utility service contracts that attempt to destroy competition. Accordingly, we reverse the commission's order.[1]

{¶ 16} We will not reverse a commission order unless it is against the manifest weight of the evidence. R.C. 4903.13. Nor will we reweigh the evidence or substitute our judgment for that of the commission on factual questions where there is sufficient probative evidence in the record to show that the commission's decision is not manifestly against the weight of the evidence and is not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *Canton Storage & Transfer Co. v. Pub. Util. Comm.* (1995), 72 Ohio St.3d 1, 4, 647 N.E.2d 136, 140; *MCI Telecommunications Corp. v. Pub. Util. Comm.* (1988), 38 Ohio St.3d 266, 268, 527 N.E.2d 777, 780. However, we have complete and independent power of review as to all questions of law. *Id.*; *Indus. Energy Consumers of Ohio Power Co. v. Pub. Util. Comm.* (1994), 68 Ohio St.3d 559, 563, 629 N.E.2d 423, 426.

---

1. Given our finding that the commission erred when interpreting R.C. 4905.33 and 4905.34, we need not reach the remaining legal and factual issues propounded by the parties.

**{¶ 17}** This case involves the interplay between R.C. 4905.33 and 4905.34 and, more specifically, the commission's resolution of that interplay. Determining whether the commission applied the proper legal standard is a question of law. *Time Warner AxS v. Pub. Util. Comm.* (1996), 75 Ohio St.3d 229, 234, 661 N.E.2d 1097, 1101; *Canton Storage & Transfer Co.,* 72 Ohio St.3d at 5, 647 N.E.2d at 140. Accordingly, we consider this question on a *de novo* basis. *MCI Telecommunications Corp.,* 38 Ohio St.3d at 268, 527 N.E.2d at 780.

**{¶ 18}** R.C. 4905.34 contracts are exempt from R.C. Chapters 4901, 4903, 4905, 4907., 4909, 4921, 4923, and 4925, including commission review under R.C. 4905.26. However, the commission has limited authority to determine the extent of its jurisdiction and whether a complaint pending before it actually involves a R.C. 4905.34 contract. *In re Complaint of Residents of Struthers* (1989), 45 Ohio St.3d 227, 543 N.E.2d 794. Once the commission determines that the complaint pending before it involves an R.C. 4905.34 contract, the commission's jurisdiction is at an end and the case must be dismissed. *Id.* The commission, therefore, erred when it exercised jurisdiction over the Ohio Edison service agreement.

**{¶ 19}** Thermal brought an R.C. 4905.26 and 4905.33 complaint against Ohio Edison. Ohio Edison sought to dismiss the complaint, asserting that R.C. 4905.34 expressly permits reduced-rate contracts with political subdivisions. Thus, the commission should have initially determined whether R.C. 4905.34 precluded its review of the complaint. Instead, all parties simply presumed that R.C. 4905.34 applied in the case at bar. The commission then proceeded to apply R.C. 4905.33 to limit the application of R.C. 4905.34. This was error. We find that R.C. 4905.34 applies in this case and is not subject to the R.C. 4905.33 prohibition against furnishing below-cost utility service for the purpose of destroying competition.

**{¶ 20}** R.C. 4905.33 provides:

"No public utility shall directly or indirectly, or by any special rate, rebate, drawback, or other device or method, charge, demand, collect, or receive from any

person, firm, or corporation a greater or lesser compensation for any services rendered, or to be rendered, except as provided in Chapters 4901., 4903., 4905., 4907., 4909., 4921., 4923., and 4925. of the Revised Code, than it charges, demands, collects, or receives from any other person, firm, or corporation for doing a like and contemporaneous service under substantially the same circumstances and conditions. *No public utility shall furnish free service or service for less than actual cost for the purpose of destroying competition.*" (Emphasis added.)

{¶ 21} Thus, public utilities must charge all similarly situated customers the same rates (*Allnet Communications Serv., Inc. v. Pub. Util. Comm.* [1994], 70 Ohio St.3d 202, 205-207, 638 N.E.2d 516, 519-520) and cannot furnish free service or service below their actual costs for the purpose of destroying competition. R.C. 4905.33 is clear and unambiguous.

{¶ 22} Immediately following this prohibition, R.C. 4905.34, prior to being amended in 1996, provided:

"*Chapters* 4901., 4903., *4905.,* 4907., 4909., 4921., 4923., and 4925. of the Revised Code *do not prevent any public utility* or railroad *from* granting any of its property for any public purpose, or *granting reduced rates or free service of any kind to* the United States, to the state or *any political subdivision of the state*, for charitable purposes, for its fairs or expositions, or to any officer or employee of such public utility or railroad or his family. *All contracts and agreements made or entered into by such public utility* or railroad *for* such use, *reduced rates*, or free service *are valid and enforc[eable] at law*. As used in this section, 'employee' includes furloughed, pensioned, and superannuated employees." (Emphasis added.)

{¶ 23} In R.C. 4905.34, the General Assembly has declared that public utilities may provide the state or its political subdivisions with reduced-rate or even free utility service notwithstanding R.C. 4905.33. We do not read R.C. 4905.34 to mean that reduced rates or free service may be granted to governmental entities

only for charitable purposes, fairs, or expositions.  These categories are merely examples of other purposes or entities to whom a public utility may grant reduced rates or free service.  The public utility may grant any of its property for any public purpose, including those so enumerated in the statute.  Furthermore, all such reduced-rate contracts are "valid and enforc[eable] at law."  R.C. 4905.34 is also clear and unambiguous.

**{¶ 24}** We find no conflict between R.C. 4905.33 and 4905.34.[2]  R.C. 4905.33 prohibits a utility from furnishing service below that utility's "actual cost for the purpose of destroying competition."  R.C. 4905.34 is exempt from the limitation in R.C. 4905.33 and not only permits a utility to enter into a reduced-rate contract with a political subdivision, but also states that these contracts are "valid and enforc[eable] at law."  Thus, public utilities can charge governmental entities special utility rates.  Had the General Assembly intended its grant of authority in R.C. 4905.34 to be limited by the last sentence in R.C. 4905.33, it would have said so.  For example, the General Assembly could have said that public utilities can grant reduced-rate or free utility service to political subdivisions *except for the purpose of destroying competition,* but it chose not to.  Therefore, R.C. 4905.34 needs no interpretation and the commission should not have limited its application by R.C. 4905.33.  *Time Warner AxS,* 75 Ohio St.3d at 237, 661 N.E.2d at 1104, citing *Provident Bank v. Wood* (1973), 36 Ohio St.2d 101, 105-106, 65 O.O.2d 296, 298, 304 N.E.2d 378, 381.

---

2. Even were we to find these two sections to be in conflict, the result would be the same.  R.C. 4905.33 is a general statute, prohibiting utilities from entering into an agreement to furnish service below their actual cost for the purpose of destroying competition.  R.C. 4905.34 is a specific statute, exempting itself from the prohibitions in R.C. 4905.33.  Absent a manifest legislative intent in R.C. 4905.33 that it should prevail in a conflict with R.C. 4905.34, the specific section takes precedence over the general section.  R.C. 1.51.  Since R.C. 4905.33 contains no such intent, a utility's right to offer a reduced-rate contract to a political subdivision under R.C. 4905.34 takes precedence.  See *Springdale v. CSX Ry. Corp.* (1994), 68 Ohio St.3d 371, 376, 627 N.E.2d 534, 538.

{¶ 25} Intervening appellee argues that Ohio Edison did not intend to use R.C. 4905.34 as authority for its reduced-rate contract with the county. However, Ohio Edison's intent is not material. The grant of authority in R.C. 4905.34 contains no requirement of prior intent and we decline to read one into this statute.

{¶ 26} The General Assembly has expressly given public utilities the authority to enter into reduced-rate contracts with political subdivisions without limitation. The General Assembly, not the commission, must make changes in the regulatory scheme to limit a utility's rights under R.C. 4905.34. If a utility's authority to enter into a reduced-rate utility contract with a political subdivision is to be limited by anti-competitive conduct, the General Assembly must effect that change. The General Assembly makes policy decisions expanding or restricting free competition. See, *e.g.*, *Time Warner AxS,* 75 Ohio St.3d at 241, 661 N.E.2d at 1106; *Canton Storage & Transfer Co.,* 72 Ohio St.3d at 5, 647 N.E.2d at 141. Absent such a change in Ohio's statutory framework, the commission is required, as we are, to apply the existing statutory provisions to all complaints and cases presented to us.

{¶ 27} We, therefore, find that R.C. 4905.34 is clear and unambiguous. We further hold that pursuant to R.C. 4905.34, a public utility's authority to grant reduced-rate utility service to a political subdivision is not subject to the R.C. 4905.33 prohibition against furnishing below-cost utility service for the purpose of destroying competition. Accordingly, the commission's order is reversed.

*Order reversed.*

DOUGLAS, F.E. SWEENEY and CLOSE, JJ., concur.

DOUGLAS, J., concurs separately.

RESNICK, J., concurs in the syllabus and judgment only.

MOYER, C.J., and PFEIFER, J., dissent.

MICHAEL L. CLOSE, J., of the Tenth Appellate District, sitting for COOK, J.

———————————

DOUGLAS, J., concurring.

{¶ 28} I concur with the judgment of the majority and its opinion. I write separately to further define what I believe the statute, R.C. 4905.34, says.

{¶ 29} In several recent cases, a majority of this court has taken some umbrage with actions of the Public Utilities Commission. Such activity should not be misinterpreted as expressing any lack of confidence in or dissatisfaction with the commission. It is my impression that the court's policy of giving great deference to the commission, as it goes about its Herculean tasks, has not changed. There just are times when a majority of the court feels constrained, given our constitutional and statutory mandates, to respectfully disagree with the commission over statutory and/or case law interpretations. The case at bar is one of those instances.

{¶ 30} I read R.C. 4905.34[3] to be straightforward and unambiguous. It says, in part, that there is nothing preventing "* * * any *public utility* * * * from *granting* any of its *property* for any *public purpose* * * *." (Emphasis added.) "Public purpose" is defined as "* * * a term of classification to distinguish the objects for which, according to settled usage, the government is to provide, from those which, by the like usage, are left to private interest, inclination, or liberality." Black's Law Dictionary (6 Ed. Rev. 1990) 1231. "Property" is defined as "[t]hat which is peculiar or proper to any person; that which belongs exclusively to one. * * *

"The word is also commonly used to denote everything which is the subject of ownership, corporeal or incorporeal, tangible or intangible, visible or invisible,

---

3. R.C. 4905.34 currently provides:

"Chapters 4901., 4903., 4905., 4907., 4909., 4921., and 4923. of the Revised Code do not prevent any public utility or railroad from granting any of its property for any public purpose, or granting reduced rates or free service of any kind to the United States, to the state or any political subdivision of the state, for charitable purposes, for fairs or expositions, to a law enforcement officer residing in free housing provided pursuant to section 3735.43 of the Revised Code, or to any officer or employee of such public utility or railroad or the officer's or employee's family. All contracts and agreements made or entered into by such public utility or railroad for such use, reduced rates, or free service are valid and enforcible [*sic*] at law. As used in this section, 'employee' includes furloughed, pensioned, and superannuated employees."

real or personal; everything that has an exchangeable value or which goes to make up wealth or estate. * * *

"* * *

"Goodwill is property * * *.

"* * * 'Property' means anything of value, including real estate, * * * contract rights, choses-in-action and other interests in or claims to wealth * * * [and] electric or other power." Black's Law Dictionary at 1216-1217.

"Grant" is defined as "[t]o bestow; to confer upon some one other than the person or entity which makes the grant. * * * To bestow or confer, with or without compensation, a gift or bestowal by one having control or authority over it * * *.

"* * * Transfer of property real or personal by deed or writing." Black's Law Dictionary at 699.

{¶ 31} It is clear (1) that appellant is a public utility, (2) that the operation of the Mahoning County jail facility is a public purpose, (3) that the product generated by appellant is property, and (4) that appellant granted, in writing, its property for a public purpose.

{¶ 32} While the statute, R.C. 4905.34, enters into a further description of the types of activities that can generate reduced rates or free service lawfully, that does not change or even modify the plenary authority of a utility to grant "any of its property for any public purpose." That should be the end of our inquiry and should have been the end of the inquiry by the commission. Our decision should not be read more broadly than this interpretation.

{¶ 33} I concur.

——————————

MOYER, J., dissenting.

{¶ 34} Because the majority misinterprets R.C. 4905.34 in violation of plain language and legislative intent, I must respectfully dissent.

**{¶ 35}** The majority notes that the Public Utilities Commission erred by failing to find that R.C. 4905.34 actually applied in the case at bar. The majority then, without explanation, declares that this section applies in the instant case. Later, the majority states that a utility needs no prior intent to rely upon R.C. 4905.34 in a given situation. I disagree with both conclusions.

**{¶ 36}** R.C. 4905.34 does not apply in this case. Ohio Edison raised R.C. 4905.34 as an affirmative defense to Thermal's complaint. Thus, Ohio Edison had the burden of going forward with the evidence to prove its defense. However, the record reflects that Ohio Edison presented no such evidence below. Absent such a showing by Ohio Edison, there is no basis for finding that R.C. 4905.34 applies in this case. Accordingly, any reliance upon that section to resolve this matter is not supported by evidence of record.

**{¶ 37}** Further, the majority misinterprets R.C. 4905.34. Based on the clear language of that section, it does not apply in competitive bidding situations, like the one below. R.C. 4905.34 permits a utility to grant "reduced rates * * * [to] any political subdivision of the state, for charitable purposes, for fairs or expositions, or to any officer or employee of such public utility or railroad or his family." Thus, the General Assembly has set forth a discrete list of civic opportunities under which a public utility may provide reduced-rate utility service to political subdivisions. The interpretive maxim *expressio unius est exclusio alterius* applies to statutes like R.C. 4905.34. *State ex rel. Celebrezze v. Natl. Lime & Stone Co.* (1994), 68 Ohio St.3d 377, 382, 627 N.E.2d 538, 542; *Vincent v. Zanesville Civ. Serv. Comm.* (1990), 54 Ohio St.3d 30, 33, 560 N.E.2d 226, 229, at fn. 2. This section designates various civic opportunities that allow public utilities to assist political subdivisions and the families of utility employees. Competitive bidding situations and the elimination of competitors from the marketplace do not appear as a designated purpose for applying this section. The clear intent of the General Assembly does not reconcile with the holding of the majority.

{¶ 38} The majority asserts that R.C. 4905.33 and 4905.34 are not in conflict. Each section appears clear and unambiguous when considered in isolation, but when read *in pari materia*, as they must be as sections addressing the same topic, the confusion is apparent. See *Consumers' Counsel v. Pub. Util. Comm.* (1983), 6 Ohio St.3d 405, 410, 6 OBR 453, 457, 453 N.E.2d 584, 588; *Consumers' Counsel v. Pub. Util. Comm.* (1983), 6 Ohio St.3d 412, 415, 6 OBR 459, 462, 453 N.E.2d 590, 592; *Fayetteville Tel. Co. v. Pub. Util. Comm.* (1982), 1 Ohio St.3d 167, 170, 1 OBR 199, 201, 438 N.E.2d 128, 131. R.C. 4905.33 prohibits a public utility from furnishing service below the utility's "actual cost for the purpose of destroying competition." Yet, R.C. 4905.34 could be interpreted to permit a utility to enter into just such a contract. These are the only two provisions in R.C. Title 49 that address the ability of a public utility to provide "free" or "reduced price services" to a customer. Since one section expressly prohibits the same conduct which the other permits, these two sections are in need of interpretation.

{¶ 39} Whenever possible, statutes are to be interpreted harmoniously, so as to give effect to both sections. *Gen. Motors Corp. v. McAvoy* (1980), 63 Ohio St.2d 232, 235, 17 O.O. 3d 143, 146, 407 N.E.2d 527, 530; R.C. 1.47. The majority did not do this. Moreover, we have given administrative construction of statutory provisions great weight under circumstances like this in the past. *Cleveland v. Pub. Util. Comm.* (1981), 67 Ohio St.2d 446, 451, 21 O.O. 3d 279, 282, 424 N.E.2d 561, 565. Here, the commission limited the scope of R.C. 4905.34 contracts by prohibiting public utilities from furnishing services below cost for the purpose of destroying competition in violation of R.C. 4905.33. *Youngstown Thermal, Ltd. Partnership v. Ohio Edison Co.* (Aug. 31, 1995), PUCO No. 93-1408-EL-CSS. The majority gave this no weight.

{¶ 40} The spirit and public policy that induced R.C. 4905.33 and 4905.34 are also important. The policy behind R.C. 4905.33 is easily determined from the words of the statute. Public utilities are prohibited from engaging in price

discrimination between similar customers. *Columbus v. Pub. Util. Comm.* (1992), 62 Ohio St.3d 430, 437-438, 584 N.E.2d 646, 651; see *Cty. Commrs. Assn. v. Pub. Util. Comm.* (1980), 63 Ohio St.2d 243, 17 O.O.3d 150, 407 N.E.2d 534. Accord R.C. 4905.33 and 4905.35. Moreover, a utility may not furnish service at a price below its actual cost for the purpose of destroying competition.

{¶ 41} The policy that produced R.C. 4905.34 is less clear. Under R.C. 4905.34, a public utility may reduce rates or give free service to any governmental body. But in setting out this permissive authority, the General Assembly created a list of recipients of such benefits, including charitable purposes, fairs, expositions, or officers and employees of the utility and their families. The purpose of R.C. 4905.34 certainly was not to permit a utility to leverage its rates to political subdivisions in order to eliminate competitors from the marketplace.

{¶ 42} Ohio utilities must charge all similarly situated customers the same rates for the same utility service. *Columbus;* see *Cty. Commrs. Assn.* R.C. 4905.34 is an exception to this rule, specifically permitting a utility to engage in rate discrimination between similarly situated customers. See *Cleveland State Univ. v. Cleveland Elec. Illum. Co.* (Oct. 15, 1987), Cuyahoga App. Nos. 52689 and 52710, unreported. Accord *Cty. Commrs. Assn*. Thus, R.C. 4905.34 should be narrowly construed as an exception to the general ratemaking policy of nondiscrimination among similarly situated customers.

{¶ 43} This construction does not subject all such contracts to commission review. The commission readily admits that it has no general jurisdiction over these contracts, and that its authority to review a contract under R.C. 4905.33 requires a complaint in order to be triggered. Nor does this construction limit a public utility's use of R.C. 4905.34 authority to enter into reduced-rate contracts with political subdivisions. However, in doing so, the utility must intend to use R.C. 4905.34 as authority to contract with a political subdivision at a below-tariff rate, much the same way that a utility must intend to use R.C. 4905.31 as authority for competitive-

response contracts that provide service that is below the standard commercial tariff. See *Columbus*, 62 Ohio St.3d at 437-438, 584 N.E.2d at 651-652. This construction also prevents a utility from using hindsight and R.C. 4905.34 in order to justify anticompetitive conduct.

{¶ 44} When the language, history, commission analysis, and public policies for these two sections are considered, the commission properly limited Ohio Edison's permissive authority under R.C. 4905.34 to provide below-cost service to a political subdivision by the express prohibition under R.C. 4905.33. This interpretation is the only one that gives credence to both sections.

{¶ 45} The majority necessarily means that contracts with public entities are exempt from any commission review, with or without a complaint being filed. Moreover, if these contracts are, as suggested by the majority, totally exempt from R.C. Chapters 4903, 4905, 4907, etc., then a public utility could breach its contract with the public authority, without risk of commission review or intervention. This result is not reasonable.

{¶ 46} We should permit the commission to review, after a complaint has properly been filed, a contract between a utility and a political subdivision to determine whether that contract was executed in violation of R.C. 4905.33.

{¶ 47} For the foregoing reasons, I respectfully dissent.

PFEIFER, J., concurs in the foregoing dissenting opinion.

—————————————