IN RE APPLICATION OF MIDDLETOWN COKE COMPANY; CITY OF MONROE,
APPELLANT; POWER SITING BOARD ET AL., APPELLEES.
[Cite as *In re Application of Middletown Coke Co.*,
127 Ohio St.3d 348, 2010-Ohio-5725.]

*Power Siting Board — Jurisdiction to certify building of cogeneration station —*
*Siting board erred in determining the scope of its jurisdiction — Further*
*development of record required — Order reversed, and cause remanded.*

(No. 2009-0941 — Submitted April 20, 2010 — Decided December 1, 2010.)

APPEAL from the Power Siting Board, No. 08-0281-EL-BGN.

_____

**LANZINGER, J.**

**{¶ 1}** This case comes before us as an appeal from an administrative order of the Power Siting Board. The siting board granted the Middletown Coke Company a certificate to build a "cogeneration station," which is part of an integrated industrial facility that will produce both purified coal and electricity. The city of Monroe, which borders the project site, appeals from that order on four grounds, mainly relating to whether the siting board erred in refusing to exercise jurisdiction over portions of the facility used to generate electricity and also to produce coke.

**{¶ 2}** We agree with Monroe and hold that the siting board erred in determining the scope of its jurisdiction. The siting board's ruling unreasonably denied Monroe an opportunity to test the company's assertion that its preferred location—a half-mile from Monroe's neighborhoods and 1,200 feet from a school—poses the "minimum adverse environmental impact" under R.C. 4906.10(A)(3). Accordingly, we reverse the order and remand this case for further proceedings.

## I. Background Facts

### A. The Siting Board's Authority

{¶ 3}   In Ohio, a "major utility facility" may not be built without the approval of the Power Siting Board.  R.C. 4906.04.  Under R.C. 4906.01(B)(1), a "major utility facility" includes "[e]lectric generating plant and associated facilities designed for, or capable of, operation at a capacity of fifty megawatts or more."  The parties agree that some part of the proposed project constitutes "electric generating plant" but disagree as to what extent.

### B. Middletown Coke's Application

{¶ 4}   The applicant in this case, the Middletown Coke Company, manufactures coke, a purified form of coal used in steel-making.  The company optioned a 250-acre site in Middletown, Ohio, near the city of Monroe, where it intends to produce both coke and electricity.  The coke will be supplied to the adjacent AK Steel Middletown Works, and the electricity will be used or sold.

{¶ 5}   Because it will produce over 50 megawatts of power, the project required siting board approval.  R.C. 4906.01(B)(1) and 4906.04.  On April 21, 2008, the company notified the siting board of its intent to build, and on June 6, it filed its application to build what it termed "the cogeneration station."

{¶ 6}   As explained in the application, the cogeneration process begins when coal is "baked" in ovens to make coke, and the baking process produces superheated gases, which must be cooled to remove pollutants.  Devices called "heat recovery steam generators" cool these gases and, as the name implies, generate steam.  By channeling this steam into a generation turbine, what began as waste heat becomes electricity.

{¶ 7}   The company defined the cogeneration station (and thus limited the application) to include only the electricity-producing turbine and related apparatus, such as cooling towers and control equipment.  The application, however, excluded the equipment that burned coal and produced steam — that is,

2

the coke ovens and heat recovery steam generators. With the coal-burning equipment excluded, the company listed the cogeneration station as a "zero emission" project.

## C. The Siting Board's Proceedings

{¶ 8}   Before it approves construction of any major utility facility, the siting board must determine that the facility "represents the minimum adverse environmental impact." R.C. 4906.10(A)(3).  In addition, the siting board's rules require applicants to provide a detailed explanation of the process used to select the proposed site and a description of alternative sites.  Ohio Adm.Code 4906-13-03 ("Site alternatives analyses") and R.C. 4906.06(A)(4) (requiring applicants to explain "why the proposed location is best suited for the facility").

{¶ 9}   Middletown Coke sought and was granted a waiver from the requirement to develop an alternative-site analysis.  The company reasoned, and the siting board agreed, that the location of the cogeneration station depended on "the location of the coke manufacturing facility, which is not required to undergo a formal site selection study."  In accordance with this waiver, the application's description of the site-selection process consisted of one paragraph explaining that the location of the cogeneration station was "constrained by the need to be adjacent to the energy source, which is the coke facility."  The application did not explain whether the company had considered other sites for the entire project (that is, including the coke facility) or how it settled on the location chosen.

## D.  Intervention of Monroe

{¶ 10} The site selected by Middletown Coke borders the city of Monroe and lies a half-mile from the city's residential neighborhoods and about 1,200 feet from a school.  On September 12, 2008, Monroe filed a motion to intervene, opposing the application.  It asserted that the source of steam for the project (the coke ovens and heat recovery steam generators) would annually emit over 2,700 tons of air pollutants and up to 160 pounds of mercury.  The city stated that

construction of the facility had not yet begun and that "it makes no more sense to disregard the source of steam for this Project than to disregard the combustion sources for a new coal-fired utility." On this basis, it asked the siting board to review the environmental impact of the entire facility, including the land and facilities used to produce coke, and to consider alternative sites.

{¶ 11} The siting board allowed the city of Monroe to intervene but disclaimed "jurisdiction over any permits for construction of the coke plant." This disclaimer set a pattern. Over the months that followed, Monroe frequently attempted to bring the full project within the scope of the siting board's review, and the siting board consistently denied that it had jurisdiction to review the environmental impact or location of "the coke plant." On that basis and to that extent, the board disallowed Monroe's discovery requests, its questions on cross-examination, and its proffered evidence. For example, the siting board would not consider testimony that nearby residents and schoolchildren were downwind of the plant and "likely to be exposed to air-borne particulate and toxic air pollutants," "daily increases" of which "are followed by increases in the number of people who die from respiratory and cardiovascular causes."

*E. The Administrative Order*

{¶ 12} On October 30, 2008, Middletown Coke and the siting board's staff filed a stipulation recommending that the board approve the application. A hearing followed, and on January 26, 2009, the siting board issued an opinion and order approving the stipulation and granting the certificate for construction of the cogeneration facility. The order, consistent with prior rulings, disclaimed jurisdiction over land and facilities used in coke production.

{¶ 13} The city of Monroe sought rehearing, which the siting board denied on March 23, 2009. Monroe has appealed, and Middletown Coke has intervened in support of appellee, the siting board.

**II. Legal Analysis**

4

### A. Standard of Review

{¶ 14} Pursuant to R.C. 4906.12, this court must apply the standard of review to power siting determinations that it applies to orders of the Public Utilities Commission. *Chester Twp. v. Power Siting Comm.* (1977), 49 Ohio St.2d 231, 238, 3 O.O.3d 367, 361 N.E.2d 436. "R.C. 4903.13 applies to board proceedings pursuant to R.C. 4906.12 and provides that an order 'shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable.' " *In re Application of Am. Transm. Sys., Inc.*, 125 Ohio St.3d 333, 2010-Ohio-1841, 928 N.E.2d 427, ¶ 17, quoting *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 50. We have " 'complete and independent power of review as to all questions of law' " in appeals from the board. *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 121 Ohio St.3d 362, 2009-Ohio-604, 904 N.E.2d 853, ¶ 13, quoting *Ohio Edison Co. v. Pub. Util. Comm.* (1997), 78 Ohio St.3d 466, 469, 678 N.E.2d 922.

{¶ 15} Monroe offers four reasons for reversing the siting board. All favor the city if the siting board erred in determining the scope of its jurisdiction. For the following reasons, we agree with the city that the siting board erred and accordingly reverse the order and remand this case for further proceedings.

### B. Error in the Board's Scope of Jurisdiction

{¶ 16} All the parties agree that some part of the proposed project constitutes "electric generating plant." No one disputes that the siting board is the agency charged with ensuring that such facilities "represent[] the minimum adverse environmental impact." R.C. 4906.10(A)(3). Nevertheless, although the facility is less than a mile from residential neighborhoods and only 1,200 feet from a school, the siting board declined even to consider whether there was another feasible location posing less environmental impact.

**{¶ 17}** The siting board reached this result by limiting its jurisdictional analysis to whether the contested facilities constituted "coke plant."[1] Finding that they did, the siting board disclaimed jurisdiction. In resolving the issue this way, the board disregarded the governing statute.

**{¶ 18}** R.C. 4906.01(B)(1) controls the jurisdictional analysis and grants the siting board jurisdiction over "[e]lectric generating plant and associated facilities designed for, or capable of, operation at a capacity of fifty megawatts or more." "Plant" means "the land, buildings, machinery, apparatus, and fixtures employed in carrying on * * * a mechanical or other industrial business." Webster's Third New International Dictionary (Ed.1986) 1731. In context, then, the siting board's jurisdiction extends to land, buildings, and equipment employed in carrying on the business of generating electricity.

**{¶ 19}** The statute's additional coverage of "associated facilities" suggests that the term should not be read restrictively. And while the statute provides a jurisdictional cut-off based on capacity ("fifty megawatts or more"), it makes no exception for an electric generating plant and "associated facilities" that produce more than one commodity. The General Assembly could have modified or limited the siting board's jurisdiction with respect to cogeneration facilities, but it has not done so, and the statute " 'must be applied as written.' " *Weiss v. Pub. Util. Comm.* (2000), 90 Ohio St.3d 15, 17, 734 N.E.2d 775, quoting *State ex rel. Purdy v. Clermont Cty. Bd. of Elections* (1997), 77 Ohio St.3d 338, 340, 673 N.E.2d 1351.

---

1. Counsel for the siting board raise one jurisdictional argument that the board did not mention or rely on in its orders below. (We assume, without deciding, that this is appropriate.) Characterizing the city's appeal as an attack on a decision of the director of the Ohio Environmental Protection Agency, the siting board's counsel argue that decisions on permits regarding the coke plant fall within the exclusive jurisdiction of the Environmental Review Appeals Commission ("ERAC"). See R.C. 3745.04(B). This argument lacks merit. Monroe plainly is not appealing from an action of the Ohio EPA, so ERAC's exclusive jurisdiction is not implicated.

{¶ 20} The siting board, as far as its orders show, never asked whether the contested land and equipment constituted "electric generating plant." It characterized as "the coke plant" anything used to make coke and then disclaimed jurisdiction, regardless of whether it was also used to generate electricity. The statute, however, *grants* jurisdiction over "electric generating plant" and does not *deny* jurisdiction over "coke plant." The question, then, is whether the contested land and facilities constitute electric generating plant. Concluding that they are "part of [a] coke plant" does not answer that question.

{¶ 21} The assumption that any given parcel of land or piece of equipment can fit into only one of two categories—coke plant *or* electric generating plant—is false. The siting board has not explained why, as a matter of logic, the same land or equipment cannot be *both* coke plant *and* electric generating plant. Nor has it cited any legal authority in support of its either-or analysis. Factually, this case demonstrates that the same land and equipment may be used in both processes and thus fit both categories.

{¶ 22} We reverse the siting board's jurisdictional ruling.

### C. The Proceedings on Remand

{¶ 23} The siting board committed the jurisdictional error early in the proceedings. In addition to affecting the scope of its substantive investigation and analysis, the siting board also limited the scope of discovery, cross-examination, and Monroe's ability to introduce its own evidence into the record. It would be inconsistent with our reviewing function to conduct the requisite jurisdictional analysis in the first instance, particularly in the absence of a developed record. See, e.g., *Indus. Energy Users-Ohio v. Pub. Util. Comm.*, 117 Ohio St.3d 486, 2008-Ohio-990, 885 N.E.2d 195, ¶ 4 (remanding "matter to the commission for further findings" where "record [was] not fully developed"); *W. Res. Transit Auth. v. Pub. Util. Comm.* (1974), 39 Ohio St.2d 16, 19, 68 O.O.2d 9, 313 N.E.2d 811 (matters arising under R.C. Chapter 4905 related to the general powers of the

Public Utilities Commission "are best heard, in the first instance, as required by law, by the * * * Commission"). Therefore, on remand, the siting board may determine how best to revisit the matters affected by its jurisdictional ruling. Nevertheless, in the interests of judicial economy and to provide guidance on remand, we address the following points of dispute.

{¶ 24} First, at least some of the specific equipment over which the siting board disclaimed jurisdiction may constitute an "electric generating plant" — that is, equipment to be employed in the business of generating electricity. The siting board analyzed only one category of "coke plant" equipment in detail: heat recovery steam generators. These steam generators perform at least two tasks. They cool gas produced during the coking process and produce steam "used to generate electricity." As a company witness testified, "the cogeneration station can't operate without steam," and there is no "other source of steam * * * aside from the steam generated by the * * * steam generators." Thus, although steam generators play a part in producing coke, they may also be essential to generating electricity.

{¶ 25} We leave such questions to the board to resolve in the first instance.

{¶ 26} Furthermore, although the fact that the project will produce a substantial amount of coke does not go to jurisdiction, it could well be relevant to the substantive analysis. R.C. 4906.10(A)(3), for example, requires the siting board to determine "[t]hat the facility represents the minimum adverse environmental impact," but then tempers this stringent minimum-impact requirement by requiring the siting board to "consider[] the state of available technology and the nature and economics of the various alternatives, and other pertinent considerations." This statute broadly authorizes the siting board to balance just the sort of concerns raised by this case.

{¶ 27} As a result of its erroneous jurisdictional ruling, the siting board never engaged in the balancing of interests required in this case. In any event, these balancing decisions must be "render[ed] * * * upon the record," R.C. 4906.10(A), and the siting board's rulings unreasonably limited Monroe's opportunities to develop the record.

{¶ 28} It may well be that the best place for this generation facility is less than a mile from Monroe's homes and schools, but the city is entitled to test that proposition through an effective adversarial proceeding. With a fully developed record and fact-supported explanation, effective judicial review will be possible.

### III. Conclusion

{¶ 29} The order of the Ohio Power Siting Board is reversed, and the cause is remanded for further proceedings consistent with this opinion.

Order reversed

and cause remanded.

PFEIFER, O'CONNOR, O'DONNELL, and CUPP, JJ., concur.

LUNDBERG STRATTON, J., dissents.

BROWN, C.J., not participating.

_____

**LUNDBERG STRATTON, J., dissenting.**

{¶ 30} I believe that the Power Siting Board has jurisdiction over the cogeneration station (power plant) only. Therefore, I respectfully dissent.

{¶ 31} SunCoke Energy Inc., which owns Middletown Coke Company, filed an application for a certificate of environmental compatibility and public need to build a power plant as part of a coke plant adjacent to AK Steel Middletown Works in Butler County. The power plant is to include a steam turbine generator, a steam condensing system, a steam turbine operation and administrative building, cooling towers, and a generator step-up transformer. Heat from the coke plant's ovens would be converted into steam, which would be

used as fuel for the power plant. The board approved SunCoke's application for the power plant, concluding that the site chosen for the power plant would have "minimum adverse environmental impact," R.C. 4906.10(A)(3), and would "serve the public interest, convenience, and necessity." R.C. 4906.10(A)(6). The board did not consider the environmental impact of the proposed coke plant in making this decision.

{¶ 32} The majority holds that the board has jurisdiction to examine the impact of the proposed power plant *and* the proposed coke plant. Consequently, the majority holds that on remand, the board may consider additional issues, such as whether coke production has an adverse environmental impact.

{¶ 33} Although we have "complete and independent power of review as to all questions of law" in appeals from the siting board, *Ohio Edison Co. v. Pub. Util. Comm.* (1997), 78 Ohio St.3d 466, 469, 678 N.E.2d 922, we "may rely on the expertise of a state agency in interpreting a law where 'highly specialized issues' are involved and 'where agency expertise would, therefore, be of assistance in discerning the presumed intent of our General Assembly,' " *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 121 Ohio St.3d 362, 2009-Ohio-604, 904 N.E.2d 853, ¶ 13, quoting *Consumers' Counsel v. Pub. Util. Comm.* (1979), 58 Ohio St.2d 108, 110, 12 O.O.3d 115, 388 N.E.2d 1370. In the instant case, I would defer to the board's conclusion that it had jurisdiction over the power plant but not the proposed coke plant.

### Coke Plants Are Not "Associated Facilities"

{¶ 34} Pursuant to R.C. 4906.04, the board has jurisdiction over construction of a "major utility facility," which is defined as an "[e]lectric generating plant and associated facilities *designed for*, or *capable of*, *operation at a capacity of fifty megawatts or more.*" (Emphasis added.) R.C. 4906.01(B)(1).

{¶ 35} The majority reasons, "The statute's additional coverage of 'associated facilities' suggests the term should *not* be read restrictively."

(Emphasis added.) Majority opinion at ¶ 19. The majority later concludes that the proposed coke plant is an associated facility as defined in R.C. 4906.04(B)(1).

{¶ 36} I believe that the majority takes the term "associated facilities" out of context. The rule of noscitur a sociis assists in defining the terms "electric generating plant" and "associated facilities." The rule of noscitur a sociis, the word " 'is known from its associates,' * * * follows from the premise that 'the coupling of words denotes an intention that they should be understood in the same general sense.' " *Wilson v. Stark Cty. Dept. of Human Servs.* (1994), 70 Ohio St.3d 450, 453, 639 N.E.2d 105, quoting 2A Sutherland Statutory Construction (5th Ed. Singer Rev.1992) 183, Section 47.16.

{¶ 37} Applying this rule, I would hold that the phrase "designed for, or capable of, operation at a capacity of fifty megawatts or more" modifies both "[e]lectric generating plant" and "associated facilities." Thus, contrary to the majority, I would find that "associated facilities" is a restrictive term, not an expansive term. Specifically, a facility would qualify as an "associated facility" only if it is "designed for" or is "capable of" producing electricity.

{¶ 38} In the instant case, the proposed coke plant is *not* designed for, nor will it be capable of, producing electricity. It is intended to make coke. The heat that is used to create steam as fuel for the power plant is merely a waste product of that process. Thus, I would hold that the proposed coke plant is not an associated facility as defined in R.C. 4906.01(B)(1).

**The EPA Has Jurisdiction over Coke Plants**

{¶ 39} The majority also supports its holding by reasoning that while R.C. 4906.01(B)(1) "*grants* jurisdiction over an 'electric generating plant,' " it "does not *deny* jurisdiction over 'coke plant.' " (Emphasis sic.) Majority opinion at ¶ 20. Consequently, the majority indicates that on remand, the board may consider the environmental impact of the coke plant in deciding whether the power station should be permitted. The majority's reasoning and the scope of this remand are

especially troubling when considered in the context of arguments made by appellant, the city of Monroe, that the proposed coke plant will threaten the "region's air quality."

{¶ 40} The Ohio Environmental Protection Agency ("EPA") regulates coke ovens. R.C. 3704.03(F)(1). See also *State ex rel. Sierra Club v. Koncelik,* Franklin App. No. 05AP-643, 2005-Ohio-6477, ¶ 3 (construction of coke ovens requires a permit from the Ohio EPA). Consequently, any consideration by the board regarding the emissions of the proposed coke ovens necessarily intrudes upon the Ohio EPA's jurisdiction.

{¶ 41} At the hearing before the administrative law judge in the instant case, the following exchange took place:

{¶ 42} F. Joseph Schiavone, an intervenor in the dispute, stated: "Your Honor, at this time I would ask a continuance of this matter in so much as to proceed at this time would be premature based upon — two reasons. First of all, the Ohio EPA has yet to rule on Middletown Coke's Application for permit to install and there is a possibility if this Board were to –- or if this Judge were to grant the permit, construction would begin immediately on this cogeneration plant. And we could find ourselves in a situation with a generation plant without an upstream power source if the Ohio EPA were to find that for whatever reason a permit would not be granted or it would be granted conditionally upon conditions that could not be met by Middletown Coke."

{¶ 43} M. Howard Petricoff, attorney for Middletown Coke, responded: "Your Honor, the premise on which this motion is based is that the project would have to be ready to go and have approvals from other agencies other than the Power Siting Board before the Power Siting Board could rule. There is no citation in this motion as to any statute, rule, regulation, or other legal requirement that calls for the EPA permit to have been issued or for all the land to be purchased."

**{¶ 44}** From this conversation, it is evident that the parties anticipated that the coke plant would be regulated by the Ohio EPA, not the board. Moreover, one of the board members who signed the board's opinion, order, and certificate considering and approving the power plant only was Christopher Korleski, who is also the director of the Ohio EPA.

**{¶ 45}** The majority's holding will provide the board the authority to trump the EPA regarding the construction of the proposed coke plant.

### Conclusion

**{¶ 46}** I believe that the majority's holding expands the board's jurisdiction beyond what the General Assembly intended and that it encroaches upon the Ohio EPA's jurisdiction to regulate coke ovens. Consequently, I would defer to the board's decision that it has jurisdiction over the proposed power plant but not the proposed coke plant. Thus, I would affirm the decision of the Power Siting Board. Accordingly, I respectfully dissent.

_____

Van Kley & Walker, L.L.C., Jack Van Kley, and Christopher A. Walker; and K. Philip Callahan, Monroe Law Director, for appellant.

Richard Cordray, Attorney General, and Samuel Peterson, Margaret A. Malone, Duane W. Luckey, and Thomas G. Lindgren, Assistant Attorneys General, for appellee, Ohio Power Siting Board.

Vorys, Sater, Seymour & Pease, L.L.P., M. Howard Petricoff, and Stephen M. Howard, for intervening appellee, Middletown Coke Company.

_____