**[Cite as *In re Complaint of OHIOTELNET.COM, INC. v. Windstream Ohio, Inc.,* 137 Ohio St.3d 339, 2013-Ohio-4721.]**

IN RE COMPLAINT OF **OHIOTELNET.COM, INC.**, APPELLANT, *v.* **WINDSTREAM OHIO, INC.**, INTERVENING APPELLEE; PUBLIC UTILITIES COMMISSION, APPELLEE.

[Cite as *In re Complaint of OHIOTELNET.COM, INC. v. Windstream Ohio, Inc.,* **137 Ohio St.3d 339, 2013-Ohio-4721.**]

*Public utilities—Telecommunication services—Appellant must show that Public Utilities Commission's orders were unreasonable or unlawful—Orders affirmed.*

(No. 2012-0027—Submitted August 21, 2013—Decided October 29, 2013.)

APPEAL from the Public Utilities Commission of Ohio, No. 09-515-TP-CSS.

————————————

**O'CONNOR, C.J.**

## SUMMARY

**{¶ 1}** Appellant, OHIOTELNET.COM, INC. ("Ohiotelnet"), is a competitive local exchange carrier and provides telephone and other telecommunications services in Licking and surrounding counties in Ohio. Intervening appellee, Windstream Ohio, Inc., is an incumbent local exchange carrier that sells telecommunications services at both wholesale and retail prices. Ohiotelnet purchases services from Windstream at wholesale rates and resells the services to end-user consumers at retail rates.

**{¶ 2}** Ohiotelnet filed a complaint with the Public Utilities Commission ("PUCO" or "commission") pursuant to R.C. 4905.26, alleging that Windstream had overcharged for its services and submitted inaccurate billing invoices to Ohiotelnet. Ohiotelnet further alleged that Windstream had failed to act in good faith in resolving billing disputes and had refused to issue billing credits on thousands of valid disputes.

**{¶ 3}** The commission denied the complaint after finding that Ohiotelnet had failed to sustain its burden of proof. Specifically, the commission found that Ohiotelnet failed to submit sufficient credible evidence that Windstream had refused to issue credits for valid billing disputes. *In re Complaint of OHIOTELNET.COM, INC. v. Windstream Ohio, Inc.*, Pub. Util. Comm. No. 09-515-TP-CSS, at 19-20 (Sept. 20, 2011), available at http://dis.puc.state.oh.us /DocumentRecord.aspx?DocID=53d57a11-d632-425d-aea5-e8078262c376; and at 2-3 (Nov. 9, 2011), available at http://dis.puc.state.oh.us/Document Record.aspx?DocID=25fb2113-da0a-49b2-b12b-43afca3b824d.

**{¶ 4}** Ohiotelnet appealed to this court, raising one proposition of law. Ohiotelnet contends that the commission disregarded its duty by not conducting a complete and thorough review of the evidence. Ohiotelnet, however, has failed to demonstrate error. Therefore, we affirm the commission's orders.

## FACTS AND PROCEDURAL BACKGROUND

**{¶ 5}** Ohiotelnet's relationship with Windstream began in 2001 when the commission approved an interconnection agreement between Ohiotelnet and Alltel Ohio, Inc., the predecessor to Windstream. *In re Petition of OHIOTELNET.COM, INC., for Arbitration of Interconnection Rates, Terms & Conditions & Related Arrangements with ALLTEL, Ohio, Inc.*, Pub. Util. Comm. No. 00-1601-TP-ARB (Mar. 1, 2001), available at http://dis.puc.state.oh.us/ DocumentRecord.aspx?DocID=CB3803290D87A4B685256A030055082D. The agreement established rates, charges, terms, and conditions for the interconnection of the parties' telecommunications networks and included procedures for processing service orders, billing invoices, and billing disputes.

**{¶ 6}** Ohiotelnet has been submitting billing disputes to Windstream on a regular basis for several years. Since 2004, Ohiotelnet has submitted over 17,000 billing disputes to Windstream regarding resale services and related billing invoices. Among other billing disputes, Ohiotelnet alleged that it was entitled to

credits because Windstream had (1) failed to correctly and timely process service orders, (2) charged for services that did not exist, (3) charged for calls that should have been blocked, (4) improperly charged for third-party long-distance-carrier calls, (5) improperly delayed certain billing charges, and (6) failed to remit taxes on charges that had been credited. Windstream processed these disputes, granting some and denying others. From 2004 to 2010, Ohiotelnet disputed amounts totaling $114,780. Windstream granted credits to Ohiotelnet in the amount of $56,942, roughly half of what Ohiotelnet had requested.

{¶ 7} On June 19, 2009, Ohiotelnet filed a complaint against Windstream with the commission pursuant to R.C. 4905.26. In its complaint, Ohiotelnet alleged that Windstream had overcharged for certain resale services, submitted inaccurate billing invoices to Ohiotelnet, and refused to issue billing credits on thousands of valid disputes. According to Ohiotelnet, Windstream owed $76,436 in overcharges.

{¶ 8} An evidentiary hearing was held before the commission in December 2010. To prove its case that Windstream had refused to issue credits for valid billing disputes, Ohiotelnet relied heavily on two sets of exhibits submitted in CD-ROM format: Exhibit No. 1 and Exhibits No. 2 through No. 75. Ohiotelnet Exhibit No. 1 is a 287-page spreadsheet that reduced each billing dispute to a line item. Each line item of the spreadsheet contains the (1) billing-dispute number, (2) billing date, (3) end-user phone number, (4) service code (which identifies the type of service in dispute), (5) credit amount requested, (6) credit amount approved, (7) tax credit, (8) date dispute was closed, and (9) remaining disputed amount (if any). Ohiotelnet Exhibits No. 2 through No. 75 are copies of billing invoices issued by Windstream to Ohiotelnet dating from April 2004 to June 2010.

{¶ 9} In addition to these exhibits, Ohiotelnet presented the testimony of Annette Duboe, the Ohiotelnet employee who had prepared the spreadsheet to

track billing disputes and requests for credit from Windstream. As part of her testimony, Duboe described the procedure for identifying billing disputes and requests for credit from the record, presenting six specific examples of how she had calculated billing credits using these exhibits. Duboe also referred to Ohiotelnet Exhibit No. 79 (the "prehearing statement") in her testimony. The prehearing statement provides an explanation of the service codes, which were identified only as acronyms on the spreadsheet. The prehearing statement also provides a list of reasons for the billing disputes for each type of service, as well as the purported number of outstanding billing disputes relating to each service.

{¶ 10} Following the filing of posthearing briefs, the commission issued its opinion and order on September 20, 2011. As to the sole issue before this court, the commission held that Ohiotelnet had not carried its burden of proving that Windstream had denied valid billing claims. The commission found that Windstream had successfully undermined the credibility of Ohiotelnet's account of billing disputes by identifying several inaccuracies in Ohiotelnet's exhibits. More broadly, the commission determined that it could not extrapolate from the evidence that Ohiotelnet was entitled to the amount of billing credits requested from Windstream, or even to some lesser amount.

{¶ 11} Ohiotelnet filed an application for rehearing, arguing that the commission had failed to conduct a complete and thorough review of the exhibits. Ohiotelnet claimed that Duboe had demonstrated the procedure for identifying valid credit requests from the record, and it faulted the commission for not reviewing each line-item billing dispute using the method described by Duboe. In the entry denying rehearing, the commission conceded that it did not examine each line-item billing dispute but rejected Ohiotelnet's contention that this demonstrated error. According to the commission, undertaking a line-by-line review of each billing dispute without the benefit of supporting argument or

4

cross-examination would be tantamount to the commission taking on the burden of proof that Ohiotelnet is obligated to carry.

{¶ 12} Ohiotelnet filed the instant appeal challenging the commission's orders.

## STANDARD OF REVIEW

{¶ 13} "R.C. 4903.13 provides that a PUCO order shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable." *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 50. Although we have "complete and independent power of review as to all questions of law" in appeals from the PUCO, *Ohio Edison Co. v. Pub. Util. Comm.*, 78 Ohio St.3d 466, 469, 678 N.E.2d 922 (1997), we may rely on the expertise of a state agency in interpreting a law when "highly specialized issues" are involved and when "agency expertise would, therefore, be of assistance in discerning the presumed intent of our General Assembly," *Consumers' Counsel v. Pub. Util. Comm.*, 58 Ohio St.2d 108, 110, 388 N.E.2d 1370 (1979).

{¶ 14} We will not reverse or modify a PUCO decision as to questions of fact when the record contains sufficient probative evidence to show that the commission's decision was not manifestly against the weight of the evidence and was not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *Monongahela Power Co. v. Pub. Util. Comm.*, 104 Ohio St.3d 571, 2004-Ohio-6896, 820 N.E.2d 921, ¶ 29. The appellant bears the burden of demonstrating that the commission's decision is against the manifest weight of the evidence or is clearly unsupported by the record. *Id*.

## DISCUSSION

{¶ 15} Ohiotelnet offers a single argument for overturning the orders— that the commission failed to conduct a complete and thorough review of

Ohiotelnet's exhibits. We find that Ohiotelnet has failed to show that the commission's review of the evidence was unlawful or unreasonable.

## I. Ohiotelnet has failed to offer any legal authority to support its argument that the commission acted unlawfully

{¶ 16} Ohiotelnet's sole theory is that the commission willfully disregarded its duty by failing to conduct a complete and thorough review of Ohiotelnet's evidence. But Ohiotelnet does not support this theory with even a single legal authority that addresses the commission's alleged error. That is, Ohiotelnet fails to identify which statute or case law imposes such a duty on the commission or explain what that legal standard entails.

{¶ 17} Ohiotelnet's failure to develop an authority-based argument provides sufficient grounds to deny its claim that the commission's decision was unlawful. *In re Application of Columbus S. Power Co.*, 129 Ohio St.3d 271, 2011-Ohio-2638, 951 N.E.2d 751, ¶ 14 (the appellant's failure to "cite a single legal authority" or "present an argument that a legal authority applies on these facts and was violated * * * alone is grounds to reject [a] claim"). *See also Util. Serv. Partners, Inc. v. Pub. Util. Comm.*, 124 Ohio St.3d 284, 2009-Ohio-6764, 921 N.E.2d 1038, ¶ 39 ("unsupported legal conclusions" do not establish error) and ¶ 53 (rejecting a claim when "[n]o argument [was] supplied regarding whether the relevant case law, applied to the facts of this case, justifies a decision in [appellant's] favor").

## II. The commission's limited review of Ohiotelnet's exhibits was reasonable

{¶ 18} Ohiotelnet alleged in its complaint that it was entitled to billing credits because Windstream had overcharged for its services and submitted inaccurate billing invoices. As the complainant at the commission, Ohiotelnet had the burden to present sufficient evidence to support the allegations in its complaint. *See Grossman v. Pub. Util. Comm.*, 5 Ohio St.2d 189, 214 N.E.2d 666

(1966). Ohiotelnet believes that it met its burden and proved the validity of the billing disputes solely through the submission of Exhibit Nos. 1 through 75.

{¶ 19} Ohiotelnet is incorrect. The record supports the commission's determination that Ohiotelnet failed to carry its burden of proof.

### A. Ohiotelnet's evidence

{¶ 20} Before the commission, Ohiotelnet relied heavily on two sets of exhibits. The first was the 287-page spreadsheet that contained more than 17,000 billing disputes. The spreadsheet reduced each dispute to a line item that contained categories listing the (1) billing-dispute number, (2) billing date, (3) end-user phone number, (4) service code, (5) credit amount requested, (6) credit amount approved, (7) tax credit, (8) date dispute was closed, and (9) disputed amount (if any).[1] The second set of exhibits included thousands of copies of billing invoices issued by Windstream to Ohiotelnet from 2004 to 2010. Ohiotelnet also relied on its prehearing statement, which contained an explanation of the service codes and an accompanying statement of the reasons for the credit requests.

{¶ 21} In addition to this documentary evidence, Ohiotelnet offered the testimony of Annette Duboe, the Ohiotelnet employee who had prepared the spreadsheet to track billing disputes and requests for credit from Windstream. As part of her testimony, Duboe described the procedure that she had used to identify billing disputes and calculate requests for credit using these exhibits. According to Duboe, she itemized each monthly bill from Windstream and compared it to the orders and "trouble tickets" that Ohiotelnet had placed with Windstream Express.[2] She then compiled this information on the spreadsheet to track the status of each

---

1. The spreadsheet was not limited to those disputes for which Ohiotelnet was seeking billing credits. Rather, it included all billing disputes, even those that had been resolved in Ohiotelnet's favor before the hearing in this case.

2. Ohiotelnet used trouble tickets to track complaints from their end-user customers. Windstream Express is the online program that Windstream uses to track orders and billing disputes.

billing dispute and request for credit that Ohiotelnet had made to Windstream. Duboe averred that she would regularly update the spreadsheet to reflect new disputes and the resolution of old disputes.

{¶ 22} Ohiotelnet maintained that Duboe's testimony provided a roadmap to identify valid credits using the spreadsheet and billing invoices. Duboe testified that it would be necessary to examine the spreadsheet line by line—cross-referencing the billing invoices and the prehearing statement—to determine the basis and validity of each billing dispute. Duboe provided six examples of how she had used the spreadsheet, billing invoices, and prehearing statement to identify billing credits that Windstream allegedly owed to Ohiotelnet.

**B.      Ohiotelnet's evidence does not establish the**
**validity of any billing dispute**

{¶ 23} Ohiotelnet expected that the commission's hearing examiner would conduct a line-by-line review of each billing dispute listed in the spreadsheet, using the procedure employed by Duboe. We find that the commission was justified in refusing to conduct such a review.

{¶ 24} The critical problem for Ohiotelnet is that the validity of the billing disputes is not self-evident from reviewing the spreadsheet, billing invoices, and prehearing statement. The first column of the spreadsheet identifies the dispute number, the third column lists the end user's phone number, and the fourth column lists the service codes. The spreadsheet lists the service codes as acronyms, but it does not define the acronyms. An explanation of the service codes is contained instead in the prehearing statement. But the prehearing statement also lists several possible reasons underlying the various types of service disputes. For example, one of the service codes on the spreadsheet is "SOCRR," which the prehearing statement identifies as an "Order Fees" service dispute. The prehearing statement lists seven different reasons as a possible basis for this particular dispute: (1) the service was not completed on time, (2) the

service was not done correctly, (3) the service was not ordered, (4) the service was cancelled but Windstream continued to bill for it, (5) the service was double charged, (6) the phone number was invalid, or (7) no credit was given for having to switch because of a disconnect. The prehearing statement does not, however, identify which of these seven reasons Ohiotelnet relied on as the basis for this particular billing dispute. Likewise, the spreadsheet and billing invoices fail to provide the exact basis for the billing dispute. Indeed, Duboe admitted, under questioning from the hearing examiner, that the nature of each billing dispute could not be determined from a review of these exhibits.

{¶ 25} The failure to identify the exact basis for each billing dispute is fatal to Ohiotelnet's claim. Without any additional evidence, the commission was left to guess the exact basis for each billing dispute. Without that information, it was impossible for the commission to determine the validity of any billing-credit request. In the end, Ohiotelnet has failed to provide the type of evidence necessary to prove the validity of its claims. At best, Ohiotelnet's exhibits establish merely the existence of billing disputes between Ohiotelnet and Windstream. But even if the commission had done as Ohiotelnet asked and reviewed each line-item billing dispute, it would not have been able to determine whether Ohiotelnet was entitled to the requested billing credits.

## CONCLUSION

{¶ 26} Ohiotelnet has the burden of demonstrating that the commission's orders were unreasonable or unlawful. *AT & T Communications of Ohio, Inc. v. Pub. Util. Comm.*, 51 Ohio St.3d 150, 154, 555 N.E.2d 288 (1990). Ohiotelnet has not carried that burden in this appeal. Accordingly, we affirm the commission's orders.

Orders affirmed.

PFEIFER, O'DONNELL, LANZINGER, KENNEDY, FRENCH, and O'NEILL, JJ., concur.

_____

Morrow, Gordon & Byrd, Ltd., and James R. Cooper, for appellant.

Michael DeWine, Attorney General, and Werner L. Margard, Devin D. Parram, and William L. Wright, Assistant Attorneys General, for appellee.

Bailey Cavalieri, L.L.C., and William A. Adams, for intervening appellee.

_____