[This decision has been published in *Ohio Official Reports* at 92 Ohio St.3d 177.]

CINCINNATI BELL TELEPHONE COMPANY, APPELLANT, *v*. PUBLIC UTILITIES COMMISSION OF OHIO, APPELLEE.

[Cite as *Cincinnati Bell Tel. Co. v. Pub. Util. Comm*., 2001-Ohio-134.]

*Public Utilities Commission—Access by new competitive local exchange carrier to local markets—Commission's order denying Cincinnati Bell Telephone Company's proposed local phone line charge not manifestly against the weight of evidence and not unreasonable or unlawful—Commission's order to reject Cincinnati Bell's cost study for its directory assistance database and to adopt rates deemed presumptively reasonable by the Federal Communications Commission was based on ample evidence, was not against the manifest weight of the evidence, and was neither unreasonable nor unlawful.*

(No. 00-507—Submitted January 30, 2001—Decided July 5, 2001.)

APPEAL from the Public Utilities Commission of Ohio, No. 96-899-TP-ALT.

———————————

**PFEIFER, J.**

{¶ 1} In 1996, the United States Congress sought to provide for local market competition in the telecommunications industry with the passage of the Telecommunications Act of 1996 (the "1996 Act"). The 1996 Act allows for new competitive local exchange carriers ("CLECs") to enter local telephone markets by several mechanisms. One mechanism involves the CLEC's access to parts of the network of an incumbent local exchange carrier ("ILEC") as unbundled network elements ("UNEs") and provision of local telephone services over those elements. By using this entry method, the CLEC can use its own facilities (*e.g.*, switching) in combination with facilities of the ILEC (*e.g.*, the local phone line or "loop"). See, generally, Section 251(c)(2) through (4), Title 47, U.S.Code.

{¶ 2} Section 251(d)(1) of the 1996 Act directed the Federal Communications Commission ("FCC") to establish rules implementing the local competition provisions contained in Section 251 of the 1996 Act. On August 8, 1996, the FCC issued its comprehensive implementation order, *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, CC Docket No. 96-98, FCC 96-325 (1996), 11 FCC Record 15499.[1] The order determined that rates charged to CLECs for access to UNEs would be established using a new methodology it called TELRIC.[2] Because the Public Utilities Commission of Ohio proceeding on appeal dealt with establishing the rates charged to CLECs for access to Cincinnati Bell Company's UNEs and other facilities, the commission was correct in characterizing it as a TELRIC proceeding.

{¶ 3} This is an appeal as of right of orders of the commission in its case No. 96-899-TP-ALT, in which the appellant challenges the commission's determination of costs that devolve into the rates to be charged by Cincinnati Bell as an ILEC for several of its UNEs or other service elements to be provided to CLECs.

---

1. The Public Utilities Commission of Ohio issued its own Local Service Guidelines, which were contained in rules it promulgated in the proceeding entitled *In re Commission Investigation Relative to the Establishment of Local Exchange Competition & Other Competitive Issues*, case No. 95-845-TP-CO1. The Guidelines included in substantial part the TELRIC (see footnote 2) methodology espoused by the FCC.

2. TELRIC stands for Total Element Long Run Incremental Cost. TELRIC is a costing methodology established by the FCC that determines costs on the basis of the lowest cost and most efficient technology, using forward-looking costs. Section 51.505(b)(1), Title 47, C.F.R., rule vacated, *Iowa Util. Bd. v. Fed. Communications Comm.* (2000), 219 F.3d 744, certiorari granted, 531 U.S. ___, 121 S.Ct. 877-879, 148 L.Ed.2d 788.

I

Local Loops

**{¶ 4}** One category of UNEs for which the commission determined costs was local loops.[3]   TELRIC costing methodology and the applicable FCC and commission rules require a weighting of business and residential loops.  Cincinnati Bell's cost studies originally weighted its loop costs on the basis of eighty percent business loops and twenty percent residential loops to develop an average loop cost. That weighting was based on a marketing projection of the types of loops that CLECs were expected to request access to as UNEs.

**{¶ 5}** Upon further consideration of the requirements of TELRIC pricing theory, Cincinnati Bell decided that it was inappropriate for it to predict what loops CLECs might request access to.  Rather, Cincinnati Bell  proposed to weight the cost of business and residential loops according to the actual quantities of each type in its network.  It used its total loop universe and actual loop populations in its three rate bands, representing geographical areas, the rates and the business-to-residential weighting being different for each rate band.  After considering these changes, the commission adopted the eighty/twenty weighting proportions originally submitted by Cincinnati Bell.

**{¶ 6}** Cincinnati Bell argues that the court should reverse the commission's decision regarding the pricing of loops and remand the matter to the commission for further proceedings.  It contends that the eighty/twenty weighting proportions adopted by the commission are inaccurate, because they were based on projections of usage by CLECs that are based on a small sample of loops.  Cincinnati Bell argues that the projections should be based on the total universe of loops, as required by the TELRIC methodology adopted by the commission.

---

3. Local loops are copper wires/cables, fiber optic cable, other digital loop carriers, and other facilities between ILECs' switch locations and end-user customers, over which telephone signals are transmitted.  The TELRIC methodology assumes that customer locations and switch locations will remain unchanged.

**{¶ 7}** On the other hand, the commission argues that its finding of eighty percent business loops and twenty percent residential loops is appropriate and supported by the manifest weight of the evidence. The commission contends that Cincinnati Bell in its appeal is asking the court to reweigh the evidence and substitute its judgment for that of the commission.

**{¶ 8}** We agree with the commission. We have consistently refused to substitute our judgment for that of the commission on evidentiary matters. *Cincinnati Gas & Elec. Co. v. Pub. Util. Comm*. (1999), 86 Ohio St.3d 53, 711 N.E.2d 670; *Dayton Power & Light Co. v. Pub. Util. Comm*. (1983), 4 Ohio St.3d 91, 4 OBR 341, 447 N.E.2d 733; *Columbus v. Pub. Util. Comm*. (1959), 170 Ohio St. 105, 10 O.O.2d 4, 163 N.E.2d 167. Traditionally, we have deferred to the judgment of the commission in instances involving the commission's special expertise and its exercise of discretion, when the record supports either of two opposing positions. *AT&T Communications of Ohio, Inc. v. Pub. Util. Comm*. (1990) 51 Ohio St.3d 150, 555 N.E.2d 288; *Dayton Power & Light Co. v. Pub. Util. Comm*. (1962), 174 Ohio St. 160, 21 O.O.2d 427, 187 N.E.2d 150. We have held that we will reverse a commission order only where it is unreasonable, unlawful, or against the manifest weight of the evidence or shows misapprehension, mistake, or willful disregard of duty. *Cincinnati Gas & Elec. Co.*, 86 Ohio St.3d 53, 711 N.E.2d 670; *Ohio Edison Co. v. Pub. Util. Comm*. (1992), 63 Ohio St.3d 555, 589 N.E.2d 1292; see R.C. 4903.13.

**{¶ 9}** We have reviewed the record in the matter of local loops and find that it supports the commission's decision. Because of its unique experience and expertise, the commission is invested with a high level of discretion and is remarkably qualified to make the determination as to local loop weighting. We affirm its order.

## II

### Loop-Qualification Services Procedural Issue

{¶ 10} The commission claims that the issue of charges for loop-qualification services is not properly before the court on appeal, because it was not a subject of Cincinnati Bell's application for rehearing below and an application for rehearing is a jurisdictional prerequisite to an appeal under R.C. 4903.10. R.C. 4903.10(B) states, "Such application shall be in writing and shall set forth specifically the ground or grounds on which the applicant considers the order to be unreasonable or unlawful. No party shall in any court urge or rely on any ground for reversal, vacation, or modification not so set forth in the application."

{¶ 11} Cincinnati Bell filed an application for rehearing by the commission in which it alleged seven errors, and intervenors below filed a joint application for rehearing in which they alleged five errors. Cincinnati Bell had originally prevailed on the issue of loop-qualification charges, which was raised by the intervenors in their joint application for rehearing. On reconsideration, the commission ruled against Cincinnati Bell on the issue in its January 20, 2000 Second Entry on Rehearing.

{¶ 12} While assertion of error in an application for rehearing is a statutory jurisdictional prerequisite to an appeal on the alleged error, R.C. 4903.10 does not require that the error be alleged in the appellant's application for rehearing; it can be in an application for rehearing filed by a nonappellant intervening party. Cf. *Columbus & S. Ohio Elec. Co. v. Pub. Util. Comm.* (1984), 10 Ohio St.3d 12, 10 OBR 166, 460 N.E.2d 1108. The issue of loop-qualification charges was raised below in an intervenor's application for rehearing. Accordingly, that issue is properly before this court, and we now address it.

Substantive Issue

**{¶ 13}** Cincinnati Bell proposed that it be allowed to impose a loop-qualification charge, a nonrecurring charge to a CLEC to recover Cincinnati Bell's cost of determining the physical makeup of a specific loop.  In its January 26, 2000 Second Entry on Rehearing, the commission prohibited Cincinnati Bell from charging CLECs for the costs of performing loop-qualification services.

**{¶ 14}** Cincinnati Bell also proposed a loop-conditioning charge to recover Cincinnati Bell's costs of conditioning a loop, when requested by a CLEC, as provided by the FCC's rules.  Conditioning involves an ILEC's physical removal of devices that it had previously added to the loop.[4]  The commission approved the conditioning charge.

**{¶ 15}** On appeal, Cincinnati Bell argues that it will be necessary to qualify a loop before it can be conditioned.  It points out that the FCC's rules provide for recovery of an ILEC's cost of conditioning a loop and argues that the  services rendered in qualifying a loop should be considered conditioning  services, the costs of which are recoverable from a CLEC requesting loop conditioning.  The parties did not dispute the necessity of Cincinnati Bell's qualifying a loop before it could be conditioned.  However, it is evident that the activities and services to be performed to qualify a loop are different from those required to condition a loop.  We therefore conclude that the commission was justified in distinguishing between the two and denying Cincinnati Bell's proposed loop-qualification charge.

---

4. These devices include loading coils, bridge taps, low-pass filters, range extenders, and similar devices. ILECs such as Cincinnati Bell added these devices to the loops in order to gain architectural flexibility and voice transmission capability.  Providing these benefits diminishes the loops' capacity to deliver advanced services and thus precludes a requesting CLEC from gaining full use of the loop's capabilities. CC 96-98 Third Report and Order (1999), 15 FCC Record 3696, 3775, at paragraph 172.

**{¶ 16}** Because the commission's decision denying the proposed loop-qualification charge was not manifestly against the weight of the evidence and was not unreasonable or unlawful, we affirm the commission's order.

### III

### Directory Assistance Database

**{¶ 17}** The proceedings below also involved the pricing of Cincinnati Bell's directory assistance database, which, according to the commission's Local Service Guidelines, is to be set at a level that allows it (as an ILEC) to recover the TELRIC of providing such services, together with a reasonable contribution to the joint and common costs incurred. Guidelines, Section XV(C)(3); see footnote 1 above.

**{¶ 18}** Cincinnati Bell presented to the commission a TELRIC cost study for its directory assistance database, which considered circumstances assumed to exist in the future. The commission disagreed with a number of Cincinnati Bell's assumptions and projections. The commission also criticized Cincinnati Bell's cost study as overstating certain costs. November 4, 1999 Supplemental Opinion and Order at 65 and 66. In addition, the commission compared Cincinnati Bell's proposed directory assistance database rates to the rates charged by Bell operating companies in Texas and in New York, which it found to be significantly lower than Cincinnati Bell's proposed rates. *Id*. at 66. Based on the foregoing, the commission found that Cincinnati Bell had not presented a sufficient basis for concluding that its proposed directory assistance database rates should be adopted. *Id*.

**{¶ 19}** Having rejected Cincinnati Bell's cost study and proposed directory assistance database rates, the commission concluded that Cincinnati Bell should adopt the rates which the FCC established as presumptively reasonable: $0.04 per initial subscriber directory listing and $0.06 per updated listing. November 4, 1999 Supplemental Opinion and Order at 65-67, citing Third Report and Order in CC Docket No. 96-115 (1999), 14 FCC Record 15555, 15599-15605, paragraphs 93-94.

**{¶ 20}** On appeal Cincinnati Bell disputes the commission's rejection of certain of its cost-study assumptions and determinations and complains that the commission should not have used the rates of the Bell operating companies in Texas and New York to reject Cincinnati Bell's cost study. However, Cincinnati Bell has not established that the commission acted unreasonably or unlawfully. The commission did not adopt the rates of the other carriers in substitution for Cincinnati Bell's proposed rates. Rather, it compared the rates of other carriers to Cincinnati Bell's proposed rates to test their reasonableness. We find that the commission's comparison was sensible and warranted.

**{¶ 21}** Cincinnati Bell also criticized the commission for its adoption of the "presumptively reasonable" directory assistance database rates determined by the FCC and its application of those rates to Cincinnati Bell, because they were announced after conclusion of the hearing below. However, the FCC-announced rates became a matter of public record before the commission reached its decisions in the proceedings below, and the commission deemed them to be relevant to its deliberations. Moreover, Cincinnati Bell was granted ample opportunity to determine and to demonstrate to the commission its costs of preparing its directory assistance database, and the commission rejected Cincinnati Bell's cost determination.

**{¶ 22}** Cincinnati Bell argues that the FCC-announced rates should not be applied to Cincinnati Bell because those rates were for sales of lists to publishers of telephone directories and not for recovery of the costs of preparing a directory assistance database. However, the commission specifically found that the costs incurred by Cincinnati Bell in providing subscriber lists to directory publishers should be similar to those for providing such information to competitive carriers and based on that finding, adopted the FCC-announced rates. *Id*. at 66.

**{¶ 23}** Cincinnati Bell has failed to demonstrate that the commission acted unreasonably or unlawfully by applying the FCC-announced rates to Cincinnati

8

Bell. The commission's decisions to reject Cincinnati Bell's cost study for its directory assistance database and to adopt the rates deemed presumptively reasonable by the FCC were based on ample evidence, were not against the manifest weight of the evidence, and were neither unreasonable nor unlawful. Therefore, we affirm the commission as to the matter of the directory assistance database.

*Order affirmed.*

MOYER, C.J., DOUGLAS, MCMONAGLE, F.E. SWEENEY, COOK and LUNDBERG STRATTON, JJ., concur.

TIMOTHY E. MCMONAGLE, J., of the Eighth Appellate District, sitting for RESNICK, J.

————————————

*Frost & Jacobs, L.L.P.,* and *Douglas E. Hart,* for appellant.

*Betty D. Montgomery*, Attorney General, *Duane W. Luckey*, *Steven T. Nourse* and *Stephen A. Reilly*, Assistant Attorneys General, for appellee.

*Vorys, Sater, Seymour & Pease, L.L.P., Philip F. Downey* and *Benita A. Kahn; David J. Chorzempa*; *Sidley & Austin, Michael D. Warden* and *David L. Lawson,* urging affirmance for *amicus curiae* TCG Ohio.

*Bell, Royer & Sanders Co., L.P.A.,* and *Judith B. Sanders*, urging affirmance for *amicus curiae* WorldCom, Inc.

————————————.