[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of Duke Energy Ohio, Inc.*, Slip Opinion No. 2021-Ohio-3301.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2021-OHIO-3301

IN RE APPLICATION OF DUKE ENERGY OHIO, INC., FOR A CERTIFICATE OF ENVIRONMENTAL COMPATIBILITY AND PUBLIC NEED FOR THE C314V CENTRAL CORRIDOR PIPELINE EXTENSION PROJECT; WALTZ, CITY MGR., ET AL., APPELLANTS; POWER SITING BOARD, APPELLEE; DUKE ENERGY OHIO, INC., INTERVENING APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of Duke Energy Ohio, Inc.*, Slip Opinion No. 2021-Ohio-3301.]

*Power Siting Board—Natural-gas pipeline—R.C. 4906.10(A)—Certificate of environmental compatibility and public need—Determination approving construction, operation, and maintenance of a natural-gas pipeline was lawful, reasonable, and not manifestly against the weight of the evidence—Board did not misapply the statutory criteria, decide the issue on incomplete information, misweigh the evidence, or limit any parties' ability to meaningfully participate.*

(No. 2020-0511—Submitted March 31, 2021—Decided September 22, 2021.)

APPEAL from the Power Siting Board, No. 16-0253-GA-BTX.

_____

**STEWART, J.**

{¶ 1} Appellants, the city of Reading and its safety-service director, Patrick Ross ("Reading"); the city manager for the city of Blue Ash, David Waltz ("Blue Ash"); and Neighbors Opposed to Pipeline Extension, L.L.C. ("NOPE"), appeal an order of appellee, Ohio Power Siting Board, granting a certificate of environmental compatibility and public need to intervening appellee, Duke Energy Ohio, Inc., for the construction, operation, and maintenance of a natural-gas pipeline in Hamilton County. The appellants argue, among other things, that the board misapplied the statutory criteria governing certificate approval, decided the case on incomplete information, misweighed the evidence, and limited their ability to meaningfully participate. We disagree and affirm.

## I. FACTUAL BACKGROUND

{¶ 2} In March 2016, Duke notified the board that it would soon be applying for a certificate of environmental compatibility and public need to construct a natural-gas pipeline. Duke filed the application about five months later, stating that it had decided to reduce the pipeline's proposed diameter from 30 to 20 inches and its proposed operating pressure from 600 to 400 pounds per square inch gauge.

{¶ 3} Duke refiled and amended the application in January 2017, stating that the pipeline formed part of its "long-term planning process to retire propane-air plants, balance system supply from north to south, and support the replacement of aging infrastructure." To this end, Duke proposed two routes for the pipeline: a preferred route and an alternate route. Both routes would start at a point near the intersection of Hamilton, Warren, and Butler Counties and run approximately 13 to 14 miles in a mostly north-to-south direction through Hamilton County. The preferred route would end in Fairfax; the alternate route in Norwood.

{¶ 4} The board notified Duke in March 2017 that the application had been certified as sufficiently complete. In May 2017, the board's staff filed its

investigatory report on the proposal, recommending that the board grant a certificate for the alternate route because, among other things, that route presented fewer adverse effects on the project area.

{¶ 5} In August 2017, Duke filed a motion to stay the proceedings, explaining that it needed additional time to investigate concerns associated with specific sites along the alternate route. The board granted the motion.

{¶ 6} In April 2018, Duke asked the board to reestablish the proceedings (the board later did so) and filed a six-part supplement to the application. Duke explained that prior to the time the staff had filed its report recommending the alternate route, its focus had been on the preferred route, for which the design was partially complete and soil borings, utility locations, and surveying had been significantly completed. Duke took additional time during the stay to investigate the alternate route and meet with stakeholders, which led it to modify the alternate route's path to reduce the impact of construction on affected municipalities and businesses. Minor alignment changes, Duke said, would continue to be implemented as the engineering design progressed.

{¶ 7} Duke provided supplemental reports in July 2018, one addressing a Superfund site and the other addressing environmental risks associated with specific properties.

{¶ 8} In March 2019, the staff filed an amended investigatory report that replaced and superseded its May 2017 report. The amended report accounted for Duke's supplemental information and reports and, as before, recommended that the board consider the alternate route, subject to conditions.

{¶ 9} In November 2019, after a three-day evidentiary hearing, the board issued a lengthy order in which it determined that the proposed pipeline met the criteria of R.C. 4906.10(A) and granted Duke a certificate for the construction, operation, and maintenance of the pipeline along the alternate route, subject to 41 conditions. Several parties sought rehearing of the board's order, which the board

denied. Reading, Blue Ash, NOPE, and the village of Evendale then filed this appeal.

{¶ 10} During the appeal's pendency, we denied a motion to stay the board's order, 159 Ohio St.3d 1413, 2020-Ohio-3275, 147 N.E.3d 654, and dismissed Evendale's assignments of error and sua sponte dismissed Evendale as a party, 159 Ohio St.3d 1467, 2020-Ohio-3884, 150 N.E.3d 120.

## II. STANDARD OF REVIEW

{¶ 11} We apply the same standard of review to a board order that we would apply to an order of the Public Utilities Commission of Ohio ("PUCO"). *See In re Application of Black Fork Wind Energy, L.L.C.*, 138 Ohio St.3d 43, 2013-Ohio-5478, 3 N.E.3d 173, ¶ 10, citing R.C. 4906.12. Under this standard, we will reverse, vacate, or modify a board order "if, upon consideration of the record, [we are] of the opinion that such order was unlawful or unreasonable." R.C. 4903.13. We "will not reverse or modify a board decision as to questions of fact when the record contains sufficient probative evidence to show that the board's decision was not manifestly against the weight of the evidence and was not so clearly unsupported by the record as to show misapprehension, mistake or willful disregard of duty." *In re Application of Champaign Wind, L.L.C.*, 146 Ohio St.3d 489, 2016-Ohio-1513, 58 N.E.3d 1142, ¶ 7. Our review of legal questions is de novo. *Id.*

## III. ANALYSIS

*A. Whether Duke provided adequate information about the pipeline (Reading proposition of law No. 1; Blue Ash proposition of law No. 2)*

### 1. Reading's arguments

{¶ 12} Under Ohio law, an applicant for a gas-pipeline certificate must file with the board's chairperson "[s]uch * * * information * * * as the board by rule or order may require." R.C. 4906.06(A)(6). By rule, the application "shall include fully developed information on two * * * routes," one designated as a "preferred" route and the other as an "alternate" route. Ohio Adm.Code 4906-3-05. Each route

"shall be a viable alternative on which the applicant could construct the proposed facility." *Id.* Within 60 days of receiving the application, the chairman shall either accept it as complete and in compliance with R.C. 4906.06 and the board's rules or reject it as incomplete with a statement explaining the basis of the rejection. Ohio Adm.Code 4906-3-06(A)(1) and (2).

{¶ 13} Reading argues that the board should have denied Duke's application because the alternate-route proposal was not accompanied by "fully developed information" under Ohio Adm.Code 4906-3-05. Because Duke failed to provide this information, Reading says, the board ran afoul of due process by arbitrarily applying its rule. Reading points to Duke's supplemental filings and information, which it obtained in discovery, all of which postdate Duke's March 2017 application. In particular, Reading points to a Superfund site, a report showing that Duke had modified the alternate route to avoid impinging on a site held for future development, and a report known as the Western Route Constructability Review that shows construction challenges that Duke would incur along some of Reading's narrower roads. Reading also points to the amended staff report of March 2019, which recounts Duke's concession that "it had not evaluated th[e] [alternate] route with the level of detail necessary to pursue its potential construction," and Duke's additional investigation of the alternate route after the staff issued its May 2017 report.

{¶ 14} The board's decision all but concedes that Duke did not provide the requisite information when it was supposed to. Its order cites the testimony of Gary Hebbeler, vice president of Duke's gas operations, who explained that Duke initially focused on designing the preferred route but then shifted its focus to the alternate route after receiving the staff's May 2017 report. The board observed that it "generally expects that an applicant will have fully investigated both of its proposed routes and include 'fully developed information' on both routes in the application." Power Siting Bd. No. 16-0253-GA-BTX, ¶ 122 (Nov. 21, 2019). Yet,

5

the board determined that Duke had provided the information required by R.C. 4906.06(A) and unspecified rules, that the staff had received the information necessary to perform its investigation, that the intervenors had been afforded ample opportunity to participate in the proceeding, and that the intervenors had access to Duke's information through discovery.

{¶ 15} Under the circumstances, it is hard to fault the logic of Reading's argument that Duke's application lacked fully developed information on two routes given that Duke had to request a pause in the proceedings to shore up and submit supplemental information pertaining to the alternate route. The board responds that, as the administrative law judge found, Duke's supplemental information satisfied Ohio Adm.Code 4906-3-11(A)'s provision allowing an applicant to "submit to the board any applications for amendment to a pending accepted, complete application." But that rule speaks to amendments to the existence of a "pending accepted, complete application"; the question here is whether the application was complete before Duke supplemented it.

{¶ 16} Assuming without deciding that the board misapplied its filing requirements, Reading was not harmed by the error. In *In re Black Fork Wind Energy, L.L.C.*, 156 Ohio St.3d 181, 2018-Ohio-5206, 124 N.E.3d 787, we considered whether the board's failure to comply with the procedural requirements for amending a certificate had harmed the appellants, who had objected to the issuance of the certificate, explaining that reversal would not lie without a showing of harm. This court concluded that the appellants had been harmed in two ways. First, the board's actions deprived the appellants of a staff investigation and report, which limited the appellants' ability to make an informed challenge. *Id.* at ¶ 24. Second, but for the board's error, the appellants had shown a realistic possibility of a different outcome, namely, the application of a change in law pertaining to wind-turbine-setback requirements. *Id.* at ¶ 25.

6

{¶ 17} In this case, unlike in *In re Black Fork Wind Energy*, Reading received the benefit of not one, but two staff reports (the amended report came after Duke provided its supplemental information). Moreover, Reading has not pointed to a change in the law that might allow for a different outcome.

{¶ 18} Nor did Reading's more particularized concerns go unnoticed. Duke's supplemental information, the staff's amended report, and the board's order discuss the Superfund site at length. Moreover, the board adopted a condition requiring that Duke avoid damaging or interfering with the site and its related components.

{¶ 19} Turning to the future-development site, Duke's supplemental information, the staff's amended report, and the board's order all show that Duke adjusted the alternate route by moving the pipeline to the edge of the site.

{¶ 20} We recognize that there is some dispute whether Duke apprised the staff of information concerning the road-construction challenges, but the fact remains that Reading was able to—and did—raise this concern to the board. And in response to Reading's concern that construction activities would possibly deprive residents of their homes, the board adopted a condition requiring use of "construction techniques that will ensure that access to residences remains available throughout construction." Power Siting Bd. No. 16-0253-GA-BTX at ¶ 190, Condition 30 (Nov. 21, 2019).

{¶ 21} Last, although Reading claims that the staff was not likely to modify its alternate-route recommendation after issuing its reports, Reading was not foreclosed from attempting to dissuade the board from adopting the alternate route.

## 2. Blue Ash's arguments

{¶ 22} Blue Ash offers a variation on Reading's argument that Duke did not provide fully developed information. Blue Ash claims that it was "provided so little information that [it could not] meaningfully participate in the routing and hearing

process." It also goes so far as to say that it was not "given enough information to even know what the issues were."

{¶ 23} The argument is meritless. Blue Ash had full access to the board's docket in this case, which included, among other things,

- Duke's seven-part application seeking board approval to install the proposed pipeline, which Duke supplemented with additional information throughout the application's pendency;

- the staff's 72-page amended report addressing Duke's proposal; and

- testimony filed by Duke and the staff in advance of the evidentiary hearing.

{¶ 24} Additionally, Gordon Perry, Blue Ash's public-works director, testified that he was familiar with Duke's application, the staff's report, the project and its impact on Blue Ash, and the preferred and alternate routes. He further testified that he attended Duke's public-information sessions, where he "met with Duke's public information personnel and talked about maintenance operations, the pipeline layout, and the construction process in general." In short, Blue Ash had a firm understanding about this case.

{¶ 25} It is true, as Blue Ash observes, that an information asymmetry will often exist between a utility and the utility's opponent. *See In re Application of Am. Transm. Sys., Inc.*, 125 Ohio St.3d 333, 2010-Ohio-1841, 928 N.E.2d 427, ¶ 41 (Pfeifer, J., concurring) ("Any utility involved in a siting decision will invariably be better organized and able to devote more resources advocating its preferred route than any group opposing the utility"). But this does not mean that Blue Ash lacked the means to make its case. Blue Ash had the right to participate in discovery, take depositions, file motions to compel, and serve subpoenas. *See* Ohio Adm.Code 4906-2-14 (discovery); Ohio Adm.Code 4906-2-18 (depositions); Ohio Adm.Code 4906-2-22 (motions to compel); Ohio Adm.Code 4906-2-23 (subpoenas).

**{¶ 26}** Blue Ash next complains that Duke violated 49 C.F.R. 192.615 by failing to identify individuals who could educate and assist fire and police departments, emergency responders, and local officials about safety issues and evacuation and emergency-planning procedures. But, as the board concluded, Blue Ash fails to locate that federal regulation within an Ohio statute or board rule that applies to a certificate proceeding. In any event, as the board stated, Duke's compliance with federal regulations will be addressed in a future safety inspection by the PUCO.

**{¶ 27}** Blue Ash's argument runs into a further obstacle. Condition 40 of the board's order requires Duke to

> provide the fire and police departments, emergency responders, and local officials in the affected local jurisdictions contact information for at least two employees of [Duke] that are knowledgeable about gas pipeline safety and that can educate and assist, as needed, local officials, businesses, schools, and the community on gas pipeline safety issues, including evacuation and emergency response planning.

Power Siting Bd. No. 16-0253-GA-BTX at ¶ 107, Condition 40 (Nov. 21, 2019).

**{¶ 28}** And while precertification consultations might be preferable to avoid potential conflicts, Blue Ash concedes that after the board granted the certificate, Duke has provided the names of knowledgeable contact persons within the company and has established a public-information program.

*B. Whether the board erred in determining that Duke's proposal met the conditions of R.C. 4906.10(A)(1) (NOPE proposition of law No. 1)*

### 1. Whether the board misinterpreted R.C. 4906.10(A)(1)

{¶ 29} Under R.C. 4906.10(A)(1), the board must "find[] and determine[]" "[t]he basis of the need for the facility." NOPE argues that the board misinterpreted this provision by "merely accepting Duke Energy's corporate desires as the basis of need." In NOPE's view, the board should have considered the *general public's* need.

{¶ 30} The text of R.C. 4906.10(A)(1) is unambiguous. The board must consider "need"—not, as NOPE urges, the "general public's need." Because NOPE's argument requires us to insert words the General Assembly did not use, we reject it. *See State v. Hughes*, 86 Ohio St.3d 424, 427, 715 N.E.2d 540 (1999) ("In construing a statute, we may not add or delete words"). This reading of division (A)(1) gains added support from the language of R.C. 4906.10(A)(6), which provides that the board shall find and determine that "the facility will serve the *public* interest, convenience, and necessity." (Emphasis added.) By requiring the board to account for the "public" in division (A)(6) but not in division (A)(1), we presume that the General Assembly intended for the board to apply a different statutory analysis to each. *See Metro. Securities Co. v. Warren State Bank*, 117 Ohio St. 69, 76, 158 N.E. 81 (1927) ("Having used certain language in the one instance and wholly different language in the other, it will rather be presumed that different results were intended"). Indeed, the board came to this same conclusion, explaining that the "interests of the general public are fully considered under the public interest, convenience, and necessity criterion found in R.C. 4906.10(A)(6)." Power Siting Bd. No. 16-0253-GA-BTX, Rehearing entry, at ¶ 35 (Feb. 20, 2020).

### 2. Whether the board misweighed the evidence under R.C. 4906.10(A)(1)

{¶ 31} NOPE next challenges several of the board's evidentiary findings, claiming that they are contradicted by other evidence in the record or lack record

support. The board divided its findings into three categories. We address each in turn.[1]

### a. Propane-air facilities and storage caverns

{¶ 32} The first category pertains to Duke's propane-air facilities and storage caverns, which Duke brought online in the 1960s. The facilities consist of boilers, vaporizers, pumps, and related equipment. The caverns consist of limestone located 300 feet underground. The facilities draw propane from the caverns, whereupon the propane combines with air for injection into Duke's system. The facilities provide about 10 percent of Duke's peaking supply during extremely cold weather.

{¶ 33} The board found persuasive Duke's claim that a need for the project existed based upon the age and condition of the facilities and caverns. The board pointed to the testimony of Duke witnesses Hebbeler and Adam Long, Duke's general manager of pipeline operations, both of whom explained that the facilities' useful lives were at or near an end and that their failure could subject potentially 50,000 customers to a loss of service on a peak winter day. In particular, Long observed that the caverns cannot be inspected, repaired, upgraded, or replaced and may fail at any moment and that the proposed project would offset the loss of supply from the caverns while ensuring reliable service.

{¶ 34} The board next relied on a report prepared for Duke by Lummus, a consulting firm, which recommended that Duke consider "phasing out, closing, and decommissioning" the facilities and caverns. Lummus's report stated that the caverns "are showing signs that they are near the end of their useful life." It also stated that "[u]nlike natural gas, which is lighter than air and will quickly dissipate

---

1. In its reply brief, NOPE claims for the first time that the board's findings are not reliable because they draw in part on data related to Duke's Kentucky customers. We decline to address this newly raised argument. *Corrigan v. Illuminating Co.*, 151 Ohio St.3d 85, 2017-Ohio-7555, 86 N.E.3d 287, ¶ 11, fn. 1.

in the event of a leak, propane is heavier than air, and if leaked will seek low-lying areas where it can amass and become a more serious safety hazard."

{¶ 35} NOPE claims that the board's findings regarding the facilities and caverns are mistaken. First, it argues that the board relied on inadmissible hearsay, such as Long's statements relying on the opinions of third parties about the state of the facilities and caverns. At the hearing, the board's administrative law judge overruled a hearsay objection to Long's testimony, determining instead that the testimony would be given the "appropriate value" it deserves. NOPE's argument gets no traction because while Ohio law empowers the board to specify the rules of evidence that "shall apply to the proceeding," R.C. 4906.09, NOPE does no more than pin a label on Long's testimony. The lack of an authority-based argument defeats NOPE's contention. *See Util. Serv. Partners, Inc. v. Pub. Util. Comm.*, 124 Ohio St.3d 284, 2009-Ohio-6764, 921 N.E.2d 1038, ¶ 53 (an argument is effectively waived when "[n]o argument is supplied regarding whether the relevant case law, applied to the facts of this case, justifies a decision in [the party's] favor").

{¶ 36} Second, NOPE argues that the board's findings regarding the propensity of the caverns to leak are flawed because the findings do not derive from a geologist's testimony. But NOPE cites no requirement that the board must base its decision on such testimony. Without more, we "defer to the [board's] credibility determinations in its role as finder of fact" because Long's testimony provides "sufficient probative evidence" to support the board's finding. *Harris Design Servs. v. Columbia Gas of Ohio, Inc.*, 154 Ohio St.3d 140, 2018-Ohio-2395, 112 N.E.3d 858, ¶ 14.

{¶ 37} Third, NOPE argues that the record shows that the caverns have operated in a safe and reliable manner and that no outages have occurred when Duke has had to repair the facilities. It is true that Long could not identify leaks or other problems with the facilities and caverns. Even so, Long's testimony does not impugn the board's findings that the caverns are at or near the end of their useful

lives. And we discern nothing unreasonable or unlawful in the board's determination that "prudent system planning requires a proactive approach that includes the periodic retirement of outdated facilities," Power Siting Bd. No. 16-0253-GA-BTX at ¶ 57 (Nov. 21, 2019).

{¶ 38} Fourth, NOPE alleges, without any record citations, that the board erred in crediting Duke's modeling of its system capacity. In NOPE's view, the evidence demonstrates that Duke's system area will see a declining population and weak growth forecasts. The board, however, agreed with its staff's determination that Duke had "properly evaluated the anticipated system conditions under peak load." *Id.* It also found that Duke's analysis accorded with the Lummus report. Sufficient probative evidence supports the board's determinations.

{¶ 39} Last, NOPE points to Duke's admission in a discovery response that the existing facilities would remain operational for "several years" after the project was placed in service. In NOPE's view, this undermines Duke's claimed need to retire the plants. At first blush, NOPE would seem to have a point. But some context is helpful here—the full discovery response states: "After the [project] is in service and depending on the current system usage, [Duke] expects that the propane-air peaking plants will continue to be operational for several years before decommissioning as demand and system configurations are adjusted." The board accounted for this context in its order, determining that the plants' retirement would be driven by Duke's assessment of how the overall system responds to the project after it is placed in service. Thus, while a snippet of the discovery response arguably cuts against Duke's claim of need, the board determined that the full response does not. The board's evaluation of the evidence merits deference and we will not disturb it. *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.*, 76 Ohio St.3d 163, 165, 666 N.E.2d 1372 (1996) (the PUCO's factual determinations "are entitled to deference").

### b. North/south system supply balance

**{¶ 40}** Duke's system currently receives 55 percent of its natural-gas supply on a peak-usage winter day through a single station, the Foster Station, located in Kentucky. The board determined that although the pipeline would "not eliminate [Duke's] substantial dependence on [the] Foster Station, the [pipeline] would begin to address the issue, with the station serving approximately 45 to 50 percent of peak day load rather than 55 percent." Power Siting Bd. No. 16-0253-GA-BTX at ¶ 58 (Nov. 21, 2019).

**{¶ 41}** In NOPE's view, this reduction is an insignificant improvement that does not justify the pipeline.[2] The difficulty with NOPE's argument is its open-endedness. NOPE cites no quantitative standard for discerning the sufficiency of an improvement, so we cannot say that the board erred in crediting the pipeline's installation as mitigating Duke's dependence on the Foster Station.

**{¶ 42}** What is more, NOPE fails to reckon with the board's reliance on the Lummus report, which concluded from a qualitative perspective that Duke's dependence on the Foster Station posed a "significant exposure to reliability" and threatened "far reaching" consequences should a supply disruption occur. We recognize that other witnesses viewed the challenges posed to Duke's system by the Foster Station differently, but NOPE's reliance on these witnesses reflects at most that the evidence on this subject pointed both ways—that is not enough to justify reversal. *See In re Application of Ohio Power Co.*, 155 Ohio St.3d 326, 2018-Ohio-4698, 121 N.E.3d 320, ¶ 45 ("the mere fact that evidence before the commission points both ways does not justify reversal").

---

2. Duke claims the court cannot address this argument because, it says, NOPE did not include it in its rehearing application. We have jurisdiction to address the argument because the city of Cincinnati and the Board of County Commissioners of Hamilton County specified the issue in their rehearing application. *See Cincinnati Bell Tel. Co. v. Pub. Util. Comm.*, 92 Ohio St.3d 177, 180, 749 N.E.2d 262 (2001).

*c. Aging infrastructure*

{¶ 43} The third reason cited by the board in support of the need to implement the proposed project lay in facilitating Duke's replacement of aging pipelines. The board found Hebbeler's testimony persuasive in this regard. He testified to Duke's obligation to replace infrastructure that is near the end of its useful life and its duty to ensure compliance with federal pipeline safety regulations.[3] In particular, he addressed the need to ensure an upgrade to Line A, a pipeline constructed between the 1940s and 1960s that forms a backbone component of Duke's delivery system. The board's staff reported that the project would enable Duke to replace Line A while maintaining service.

{¶ 44} NOPE challenges the board's analysis, claiming that Duke is capable of upgrading its infrastructure without the project. It notes that Duke's Accelerated Main Replacement Program has enabled Duke to replace over 1,100 miles of main lines and over 120,000 service lines. But NOPE does not explain whether the parameters of that program would cover Line A or the project.

{¶ 45} NOPE next asserts that because Duke has maintained and repaired a section of Line A in the past without causing outages, it could do so in the future. But Hebbeler explained that the repair took place in an area of the system where sections are "easier to replace." And NOPE points to no evidence that future replacements would be done under the same conditions. Without more, NOPE cannot establish reversible error. *See In re Application of Ohio Power Co.*, 155 Ohio St.3d 326, 2018-Ohio-4698, 121 N.E.3d 320, at ¶ 50 ("We will not reverse a commission order based on speculation").

{¶ 46} Last, NOPE claims that Duke's discovery responses undermine the claim that the project is needed to upgrade and replace aging infrastructure. Duke

---

3. Federal pipeline safety regulations are set forth at 49 C.F.R. 192.1 et seq. and are administered by the Pipeline and Hazardous Materials Safety Administration. The PUCO has adopted these regulations for the purpose of intrastate enforcement. Ohio Adm.Code 4901:1-16-03.

stated that "[a]ny future upgrade, replacement, or improvement of Line A will not affect the need for the Pipeline," that it could "perform maintenance on existing lines in the central corridor without building the proposed pipeline," and that Line A could be "upgraded and/or replaced without the proposed line."

{¶ 47} Although the board accounted for these responses, noting that NOPE had cited them as a reason to deny Duke's application, it did not find them compelling enough to overcome the other record evidence. The board found persuasive Hebbeler's testimony that Line A is near the end of its useful life and must be replaced to conform to current pipeline safety regulations. It also credited his and the staff's opinions that the project would enable Duke to replace Line A without service interruptions. We will not reweigh the board's evaluation of this evidence. *See In re Complaints of Lycourt-Donovan v. Columbia Gas of Ohio, Inc.*, 152 Ohio St.3d 73, 2017-Ohio-7566, 93 N.E.3d 902, ¶ 35 ("Our function on appeal is not to reweigh the evidence or second-guess the PUCO on questions of fact").

C. *Whether the board erred in determining that Duke's proposal met the conditions of R.C. 4906.10(A)(2) (NOPE proposition of law No. 1)*

{¶ 48} Under R.C. 4906.10(A)(2), the board must find and determine "[t]he nature of the probable environmental impact" before granting a certificate. NOPE first argues that this condition is unmet because neither the staff nor Duke addressed the project's potential conflict with a planned sewer project in the city of Reading. We lack jurisdiction to address this argument because NOPE did not raise it in its notice of appeal. *See In re Application of Ohio Power Co.*, 155 Ohio St.3d 326, 2018-Ohio-4698, 121 N.E.3d 320, at ¶ 66. In any event, even if Duke or the staff did not account for NOPE's sewer argument, the board did so in its order. Moreover, NOPE does not contest Duke's observation that adjustments necessary to avoid a conflict with the sewer project have been filed with the board in a separate case or explain why these adjustments are insufficient to allay its concerns. *See In re Application of Columbus S. Power Co.*, 129 Ohio St.3d 271, 2011-Ohio-2638,

951 N.E.2d 751, ¶ 16 (suggesting that if separate proceedings are underway in another case, an appellant should explain why they are insufficient to redress its grievance).

{¶ 49} NOPE next argues that the board did not meaningfully apply R.C. 4906.10(A)(2) but instead applied a so-called "check-the-box approach" whereby the board accepted any evidence provided by Duke and then "moved on to the next requirement as if an administrative checklist was the intent of the impacts analysis." Duke counters that this court cannot consider the argument because NOPE did not raise it in its portion of the joint notice of appeal. *See In re Application of Ohio Power Co.* at ¶ 66. It is true that NOPE's portion of the joint notice of appeal does not identify this argument. Blue Ash, however, raised a similar argument in its portion of the joint notice of appeal.

{¶ 50} Assuming without deciding that NOPE's argument is jurisdictionally proper based on what Blue Ash wrote, the argument still fails, for NOPE simply cites various pages from the hearing transcript without providing analysis to aid our decision. Moreover, the board's determination under R.C. 4906.10(A)(2) spans 32 paragraphs of analysis, in which the board identifies the evidence marshaled by Duke, the staff, NOPE, and others. The board then concludes: "Based on the evidence in the record, and consistent with our findings * * * we agree that the nature of the probable environmental impact associated with the Project has been determined, in accordance with R.C. 4906.10(A)(2)." Power Siting Bd. No. 16-0253-GA-BTX at ¶ 93 (Nov. 21, 2019). NOPE's general disagreement with how the board conducted its analysis is not enough to establish reversible error. *See In re Application of Columbus S. Power* at ¶ 17 ("[Appellant] has done little more than register its disagreement with the commission's approach. That is not enough to justify reversal").

{¶ 51} Also unavailing is NOPE's citation of *Ohio Edison Co. v. Power Siting Comm.*, 56 Ohio St.2d 212, 383 N.E.2d 588 (1978). In that case, this court

determined that the board's predecessor, the power siting commission, was required by rule to analyze the recreational impact of a proposed facility. Because the commission had considered the impact in its order, this court affirmed the commission's order. In similar fashion, the board's order here shows that it conducted a lengthy analysis of the "nature of the probable environmental impact," just as R.C. 4906.10(A)(2) requires.

{¶ 52} Last, NOPE faults the board's determination that "Duke must continue to involve and inform local officials as the Company proceeds with the Project, particularly with respect to the traffic and other construction-related concerns identified by [certain] intervenors * * * [and] work with the local communities along the alternate route throughout the remainder of the siting process." Power Siting Bd. No. 16-0253-GA-BTX at ¶ 123 (Nov. 21, 2019). NOPE claims that this creates an unreasonable after-the-fact review process. We disagree. The quoted passage should be understood as creating a certificate condition, something the board is plainly empowered to do in the exercise of its statutory powers. *See* R.C. 4906.10(A) ("The power siting board shall render a decision upon the record either granting or denying the application as filed, or granting it upon such * * * *conditions* * * * as the board considers appropriate" [emphasis added]).

*D. Whether the board properly accounted for the interest of safety in evaluating Duke's proposal (Blue Ash proposition of law No. 1)*

{¶ 53} R.C. 4906.10(A)(6) requires that the board find and determine that "the facility will serve the public interest, convenience, and necessity." Blue Ash argues that the board violated this provision by overlooking safety concerns associated with the project.[4]

---

4. Although the word "safety" does not appear in R.C. 4906.10(A)(6), no one disputes that the board may consider the interests of safety in applying that division's terms.

### 1. Potential impact radius

{¶ 54} Blue Ash points to alleged irregularities in how Duke described the project's "potential impact radius," a term meaning "the radius of a circle within which the potential failure of a pipeline could have significant impact on people or property," 49 C.F.R. 192.903. Blue Ash notes that Duke described the project's potential impact radius as 326 feet on its website. At the hearing, however, Duke witness Hebbeler testified that the term did not apply because the project was classified as a high-pressure distribution line. He added that the website was perhaps referring to the original 30-inch pipeline project rather than the amended 20-inch pipeline project.

{¶ 55} Blue Ash says that the discrepancies frustrated its ability to evaluate the project's risks and that a new hearing is required to redress the problem. In support, it cites *In re Application of Middletown Coke Co.*, 127 Ohio St.3d 348, 2010-Ohio-5725, 939 N.E.2d 1210. In that case, an intervenor sought to challenge the siting of a facility, using discovery requests, questions on cross-examination, and proffered evidence. The board barred the intervenor from doing so, reasoning that the information that the intervenor sought to introduce related to subject areas over which it lacked jurisdiction. On appeal, this court determined that the board erred in its jurisdictional determination, which "affect[ed] the scope of [the board's] substantive investigation and analysis * * * [and] limited the scope of discovery, cross-examination, and [the intervenor's] ability to introduce its own evidence into the record." *Id.* at ¶ 23. The court thus remanded with instructions that the board consider the matters affected by its erroneous jurisdictional ruling.

{¶ 56} This case is readily distinguishable from *Middletown Coke*. Unlike in that case, the board here permitted Blue Ash to build its factual case, which Blue Ash did. Moreover, returning this case to the board to further analyze the potential-impact-radius issue would be futile because Blue Ash does not challenge

Hebbeler's testimony that a potential-impact-radius inquiry is unnecessary under the facts.

### 2. High-consequence areas

{¶ 57} Blue Ash next points to alleged irregularities in Duke's description of "high consequence areas," a term that generally refers to "densely populated locales where a release of gas could pose a significant risk of injury or death," *United States v. Pacific Gas & Elec. Co.*, 178 F.Supp.3d 927, 939 (N.D.Cal.2016), citing 49 C.F.R. 192.903. Blue Ash again refers to Duke's website, which explained that while only segments of the pipeline would run through high-consequence areas, it planned to construct the entire pipeline as if it were running through such areas. Blue Ash then points to Hebbeler's hearing testimony that a high-consequence-area designation has no application to a 20-inch pipeline and that the website should be changed. Blue Ash claims that Duke's wobbling on high-consequence areas caused it to overlook whether the pipeline's proximity to Summit Park, which receives about 850,000 visitors per year, would make the park a high-consequence area.

{¶ 58} It is unclear what Blue Ash is getting at with these arguments. It does not contest Hebbeler's testimony that a high-consequence-area analysis does not apply to the pipeline, and it does not dispute that the board permitted it to develop its factual case on this issue. Under these circumstances, Blue Ash has not established reversible error.

### 3. Paskett's testimony

{¶ 59} Blue Ash challenges the testimony of Duke witness Bruce Paskett, arguing that the board should have disregarded it as unreliable. Paskett is an engineer who provides consulting services to natural-gas-transmission and natural-gas-distribution pipeline operators regarding pipeline safety, pipeline-integrity management, and compliance with federal and state pipeline-safety regulations.

{¶ 60} The board pointed to Paskett's testimony to support its decision to categorize the pipeline as a distribution pipeline, to support its finding that Duke intended to exceed gas-pipeline-safety requirements to ensure the long-term safety and reliability of the pipeline, and for his analysis of pipeline-integrity-management requirements. But Blue Ash does not focus on these findings. Instead, it alleges that Paskett cherry-picked data to support his conclusions and provided inconsistent testimony concerning the probability of risk and magnitude of harm resulting from a distribution-pipeline failure. The board, however, did not rely on the portions of Paskett's testimony that Blue Ash references. It follows, then, that Blue Ash was not harmed by those portions. *See In re Application of Ohio Power Co.*, 155 Ohio St.3d 320, 2018-Ohio-4697, 121 N.E.3d 315, ¶ 18 ("The party seeking reversal of the commission's order must demonstrate prejudice or harm from the order on appeal").

### 4. Blue Ash's claim that "Duke attempted to minimize the potential risks associated with natural gas leaks"

{¶ 61} Blue Ash claims that Duke misrepresented the potential risks of natural-gas leaks that could arise from the pipeline's operation. But in the very next sentence of its brief, Blue Ash states that "[n]umerous Duke witnesses, including Hebbeler and Paskett, conceded pipeline leaks can be dangerous." Given Blue Ash's recognition that Duke acknowledged the risks associated with natural-gas leaks, there is no basis for us to conclude that Duke tried to minimize such risks.

### 5. Whether the board ignored safety risks

{¶ 62} Blue Ash intersperses its arguments concerning the reliability and candor of witnesses Paskett, Hebbeler, and Long with claims that the board ignored safety risks associated with the project. For ease of analysis, we separately address those safety-related claims here.[5]

---

5. In this section of its brief, Blue Ash also makes the conclusory argument that the board erred in classifying the pipeline as a distribution rather than transmission pipeline. Because Blue Ash cites

**{¶ 63}** First, Blue Ash points to Duke's website, which recounts five instances in which Duke violated federal-pipeline-safety requirements. In four of the five instances, an explosion resulted. If explosions happened in the past, the argument runs, then they could happen in the future. Second, it points to the pipeline's operating pressure, which the board's staff agreed is high for a distribution pipeline. The high operating pressure, Blue Ash reasons, heightens the risk of the pipeline's failure. Third, it points to statistical data on injuries and fatalities associated with the operation of distribution pipelines, observing that the risks of such incidents have risen over the past decade or so. In particular, it cites the testimony of Gordon Perry, Blue Ash's public-works director, who warned that a pipeline incident occurring near one of Blue Ash's summer events in Summit Park could result in catastrophic harm.

**{¶ 64}** Blue Ash's assertions cannot be squared with the board's order. The board observed that "safety in the construction, operation, and maintenance of facilities is of paramount importance when natural gas is involved." Power Siting Bd. No. 16-0253-GA-BTX at ¶ 152 (Nov. 21, 2019). Underscoring this statement, the board pointed to Duke's commitments to apply what Duke described as "enhanced design, construction, operation and assessment criteria" to the pipeline's installation and maintenance.

In terms of *design* enhancements, Duke promised that the pipeline would

- have a wall thickness more than twice that required for transmission lines in Class 4 locations;[6]

---

no authority in support, we reject it. *See Util. Serv. Partners*, 124 Ohio St.3d 284, 2009-Ohio-6764, 921 N.E.2d 1038, at ¶ 53.

6. The board's order, citing 49 C.F.R. 192.5, observes that a Class 4 location "is any class location unit where buildings with four or more stories above ground are prevalent; a class location unit is an onshore area that extends 220 yards on either side of the centerline of any continuous one-mile length of pipeline." Power Siting Bd. No. 16-0253-GA-BTX at ¶ 137 (Nov. 21, 2019), fn.19.

- accommodate the passage of in-line inspection tools, which is required for transmission lines but not high-pressure distribution lines;

- have five-mile valve spacing, which although not required for high-pressure distribution lines, is consistent with federal spacing requirements for Class 4 transmission pipelines; and

- have remote-control valves, which empower Duke to immediately shut down the pipeline should a problem occur.

{¶ 65} As for the *construction* enhancements, Duke promised that the pipeline would

- be installed and pressure tested to meet transmission-line requirements;

- be installed at a depth of about 48 inches of cover, which is twice that required for distribution lines and a foot deeper than that required for transmission lines; and

- receive hydrostatic pressure testing in accord with transmission-line requirements.

{¶ 66} Commenting on the *operation-and-assessment criteria*, Duke promised that it would perform an integrity assessment with in-line-inspection devices before placing the pipeline in service, then again in ten years, and then every seven years thereafter.

{¶ 67} The board also pointed to Paskett's testimony that Duke's plans had gone "above and beyond" federal requirements and the staff's conclusions that the pipeline would "meet or exceed" those requirements.

{¶ 68} Staff witness Peter Chace, gas-pipeline-safety program manager for the PUCO, whose testimony the board found persuasive, explained that while federal law permits the installation of pipelines in densely populated areas, it also subjects them to a greater level of safety precautions. He recommended that Duke take greater safety precautions than those prescribed by federal regulatory law,

namely, by allowing for the passage of internal inspection devices, using sectionalized block valves, maintaining 12 inches of clearance from underground structures, and placing underground warning tape above the pipeline as a caution to any excavators. The board adopted these recommendations as conditions of the certificate. Chace further stated that the PUCO would conduct a preoperation inspection of the pipeline, with the pipeline undergoing inspections annually or at least every other year.

{¶ 69} The board also pointed to several safety-related duties imposed on Duke by federal law, namely, the duty to carry out a written program to prevent pipeline damage resulting from excavation activities (49 C.F.R. 192.614), the duty to establish written procedures for minimizing hazards resulting from a gas-pipeline emergency (49 C.F.R. 192.615), the duty to develop and implement a written continuing-public-education program addressing, among other things, steps that should be taken for public safety in the event of a gas-pipeline release (49 C.F.R. 192.616), and the duty to maintain a written integrity-management plan addressing, among other things, threats and risks to the pipeline (49 C.F.R. 192.1007). "Duke's compliance with all of these gas pipeline safety requirements," the board observed, would "be the subject of ongoing safety inspections by the [PUCO]." Power Siting Bd. No. 16-0253-GA-BTX at ¶ 154 (Nov. 21, 2019).

{¶ 70} Blue Ash's arguments that the board ignored safety concerns regarding Summit Park miss the mark too. Although Blue Ash claimed that the board "did not even cite or address Blue Ash's testimony on this issue," the board's order cites the staff report, which identifies an impact on the park, acknowledges Blue Ash's concerns related to the park, and orders Duke in condition 12 to "minimize construction impacts [sic] in active parks and recreation areas" and conduct construction activities in such areas "during off-season or off-peak times," *id.* at ¶ 108, Condition 12.

{¶ 71} In summary, the board's findings belie Blue Ash's assertions that the board disregarded safety interests. Because there is ample evidence to support the board's conclusion that "Duke and Staff have thoroughly addressed the safety considerations related to the Project, as raised by the intervenors and the public, and that the Company has provided sufficient information on this issue," *id.* at ¶ 154, we do not second guess it. *See In re Complaints of Lycourt-Donovan*, 152 Ohio St.3d 73, 2017-Ohio-7566, 93 N.E.3d 902, at ¶ 35.

*E. Whether the board erred by not requiring Duke to evaluate Blue Ash's most recent comprehensive plan (Blue Ash proposition of law No. 3)*

{¶ 72} Under the board's rules, an applicant must describe the "impact of the facility on regional development, referring to pertinent formally adopted regional development plans," Ohio Adm.Code 4906-5-07(D)(1), and assess the "compatibility of the proposed facility and the anticipated resultant regional development with current regional land use plans," *id*. at (D)(2). Relying on this rule, Blue Ash argues that the board erred by permitting Duke to evaluate the pipeline's impact against Blue Ash's 2003 comprehensive-regional-development plan rather than its 2016 plan.

{¶ 73} The board addressed this in its order, noting that although an applicant should "attempt to obtain the most recent land use planning documents," Power Siting Bd. No. 16-0253-GA-BTX at ¶ 75 (Nov. 21, 2019), and "consult with local officials to identify and avoid conflicts," *id.* at ¶ 75, fn. 13, "Duke had provided sufficient information to comply with the rule," *id*. at ¶ 75. The board further addressed this issue in its order on rehearing, explaining that although Blue Ash's most recent plan took effect in early 2016, Duke's route-selection consultant finished its analysis in May 2016: "Given that [the consultant's] route selection study report was already completed by May 2016, we do not agree with Blue Ash's contention that there is clear evidence showing that Duke relied on outdated

information." Power Siting Bd. No. 16-0253-GA-BTX, Rehearing entry, at ¶ 71 (Feb. 20, 2020).

{¶ 74} We will presume orders are reasonable; it falls to an appellant to upset that presumption. *In re Application of Columbus S. Power Co.*, 129 Ohio St.3d 271, 2011-Ohio-2638, 951 N.E.2d 751, at ¶ 18. Here, Blue Ash asks us to reverse without furnishing a complete set of facts to guide our inquiry. Other than referring to the plan as taking effect in "early 2016," Blue Ash does not specify the precise date upon which the plan took effect or point to where in the record such a plan may be found, if at all. Nor does it specify the precise date upon which Duke's consultant began its study. Likewise, we do not know what, if any, attempts were made by Duke to obtain the most current plan. These lingering factual questions matter because, if Duke's consultant commenced its study before the 2016 plan took effect, then the consultant would have necessarily relied on the 2003 plan to do its work. Under that scenario, the 2003 plan would have been the "current plan" as the rule requires. It follows that by failing to provide a more robust factual narrative in support of its argument, Blue Ash has not upset the presumption of reasonableness that attaches to the board's order.

{¶ 75} Further, Blue Ash does not explain whether there are any material differences between the 2003 and 2016 plans. If there are none, then Blue Ash was not harmed by the consultant's reliance on the 2003 plan. And even if there are differences, it was Blue Ash's burden to point them out rather than leaving it to us to speculate about what they might be. *See In re Application of Ohio Power Co.*, 155 Ohio St.3d 326, 2018-Ohio-4698, 121 N.E.3d 320, at ¶ 50 ("We will not reverse a commission order based on speculation").

{¶ 76} Blue Ash next points to the board's findings about whether the pipeline could have been routed within Interstate 71's right-of-way.[7] Blue Ash's

---

7. Duke claims Blue Ash did not preserve this argument in its rehearing application, but Blue Ash's application does address the issue.

concern is with the board's finding that Duke did not seriously explore a route within the right-of-way because, the board said, ODOT generally does not permit utility infrastructure within its right of way. According to Blue Ash, the board's finding cannot stand because the record does not contain testimony from an ODOT official. But Blue Ash cites no authority requiring testimony from such an official. And contrary to what Blue Ash says, there is support in the record for the board's finding in the form of Duke's amended application and route-selection study.

*F. Whether the board erred in evaluating the pipeline's estimated tax benefits*
*(Blue Ash proposition of law No. 4)*

{¶ 77} Under the board's rules, an applicant must "provide an estimate of the increase in tax revenues as a result of facility placement." Ohio Adm.Code 4906-5-06(D)(5).

{¶ 78} In its amended application, Duke estimated that the alternate route would generate approximately $2.2 million in tax benefits under 2016 tax rates, with $617,000 going to Blue Ash. Duke later supplemented this information, estimating that the alternate route would generate nearly $2.9 million in tax benefits under 2018 tax rates, with a little more than $1 million going to Blue Ash. After Duke filed this supplement, Hebbeler testified that the alternate route would generate $2.2 million in tax benefits under 2016 tax rates, with $818,596 going to Blue Ash. The board determined that Duke's updated tax estimates using 2018 tax rates met the conditions of the rule, enabling a determination of the expected economic impact between the two routes.

{¶ 79} Blue Ash argues that the board's tax-estimate findings lack record support, but the preceding paragraph defeats that argument—it shows that the estimates are rooted in the record. Blue Ash next argues that the tax-estimate inconsistencies require reversal, but Blue Ash overlooks that the board focused on the most recent set of estimates, namely, those pertaining to 2018 rather than 2016. Thus, while part of Duke's estimates for 2016 arguably conflict, the same cannot

be said for 2018, because Duke provided just one estimate for 2018. And Blue Ash does not explain why it was unreasonable or unlawful for the board to rely on a more recent tax estimate, which used 2018 rather than 2016 data, in determining compliance with the rule.

*G. Whether the board deprived Blue Ash of due process of law (Blue Ash proposition of law No. 5)*

**{¶ 80}** Blue Ash argues that the board deprived it of its procedural due-process rights guaranteed under Article I, Section 16 of the Ohio Constitution by "accepting Duke's word at face value" as opposed to vetting the information bearing on Duke's application.

**{¶ 81}** In response, Duke argues that Blue Ash has deprived this court of jurisdiction to consider the argument because Blue Ash did not preserve it in a rehearing application. Duke is correct that Blue Ash's application does not preserve the argument, but Blue Ash asserts that this omission is not fatal because Reading raised a due-process argument in its rehearing application. In support, Blue Ash invokes *Cincinnati Bell Tel.*'s holding that "R.C. 4903.10 does not require that the error be alleged in the appellant's application for rehearing; it can be in an application for rehearing filed by a nonappellant intervening party," 92 Ohio St.3d at 180, 749 N.E.2d 262.

**{¶ 82}** *Cincinnati Bell Tel.* is distinguishable. We did not hold in that case that one intervenor (Reading) may raise the due-process concerns of another (Blue Ash), and Blue Ash cites no authority endorsing a group theory of due process. We therefore do not reach Blue Ash's argument.

## IV. CONCLUSION

**{¶ 83}** For the foregoing reasons, we affirm the board's order granting Duke a certificate of environmental compatibility and public need to construct, operate, and maintain a natural-gas pipeline.

Order affirmed.

O'CONNOR, C.J., and HENSAL, DEWINE, DONNELLY, and BRUNNER, JJ., concur.

KENNEDY, J., concurs, with an opinion.

JENNIFER L. HENSAL, J., of the Ninth District Court of Appeals, sitting for FISCHER, J.

_____

**KENNEDY, J., concurring.**

{¶ 84} I concur in the judgment of the majority and fully join the majority opinion. However, I write separately to address appellee Ohio Power Siting Board's failure to comply with its own administrative rules, as argued by appellants the city of Reading and its safety-service director, Patrick Ross ("Reading"), and the city manager for the city of Blue Ash, David Waltz ("Blue Ash"). An administrative agency owes a duty to the citizens of Ohio to consistently comply with its own rules and procedures. In this matter, the board unquestionably did not comply with its rules and thereby failed in its duty to the public.

{¶ 85} R.C. 4906.06(A)(6) establishes that an applicant for a gas-pipeline certificate must file with the board's chairman "[s]uch * * * information * * * as the board by rule or order may require." An application for a gas-pipeline certificate "shall include fully developed information on two * * * routes," one designated as a "preferred" route and the other as an "alternate" route. Ohio Adm.Code 4906-3-05. Within 60 days of receiving the application, the chairman has only two options—either accept it as complete and in compliance with R.C. 4906.06 and the board's rules or reject it as incomplete with a statement explaining the basis of the rejection. Ohio Adm.Code 4906-3-06(A)(1) and (2).

{¶ 86} However, neither intervening appellee, Duke Energy Ohio, Inc., nor the board complied with these straightforward rules. Duke acknowledged that when the application was filed, the preferred route was the focus of its application and the alternate route had not been fully developed. Despite this patent failure,

the board accepted the application as complete and in compliance with R.C. 4906.06 and the board's rules.

**{¶ 87}** I recognize that our case law requires that appellants Reading and Blue Ash establish that they were harmed by this alleged error, which they have not done. This does not diminish, however, the blatant failure of the board to follow its *own* rule. "While an agency has a certain amount of discretion in adopting rules to carry out the legislative objective," *Clayton v. Ohio Bd. of Nursing*, 147 Ohio St.3d 114, 2016-Ohio-643, 62 N.E.3d 132, ¶ 48 (Kennedy, J., dissenting), agencies should not be permitted to "pick and choose" which rules they will follow. Failing to be consistent in the execution of administrative rules affects the citizens of our state and does a disservice to our system of government. Administrative agencies should—and can—do better.

**{¶ 88}** I concur.

_____

David T. Stevenson, Reading Law Director, for appellants city of Reading and Patrick Ross.

Dinsmore & Shohl, L.L.P., Bryan E. Pacheco, and Mark G. Arnzen, for appellant David Waltz.

Fair Shake Environmental Legal Services and John A. Heer, for appellant Neighbors Opposed to Pipeline Extension, L.L.C.

Dave Yost, Attorney General, John J. Jones, Section Chief, and Steven L. Beeler, Thomas G. Lindgren, and Robert A. Eubanks, Assistant Attorneys General, for appellee.

Barnes & Thornburg, L.L.P., C. David Paragas, and Jeanine Kerridge; and Jeanne W. Kingery, Rocco O. D'Ascenzo, and Larisa M. Vaysman, for intervening appellee.

_____